**BARCAMERICA INTERNATIONAL USA TRUST, a California Trust, Plaintiff–counter–defendant–Appellant,**

v.

**TYFIELD IMPORTERS, INC., a corporation; Cantine Leonardo Da Vinci Soc. Coop., a.r.l., an entity of Italy, Defendants–counter–claimants–Appellees,**

v.

**George Gino Barca, Third-party-defendant.**

**No. 01–15973.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 10, 2002

Filed May 6, 2002

John P. Sutton (argued), San Francisco, CA, for Appellant Barcamerica International USA Trust.

Julius Rabinowitz (argued), Perla M. Kuhn, Hughes, Hubbard & Reed, New York, NY, Thadd A. Blizzard, Weintraub, Genshlea & Sproul, Sacramento, CA, for Appellee Tyfield Importers, Inc. and Appellee Cantine Leonardo Da Vinci Soc. Coop. a.r.l.

Thadd A. Blizzard, Weintraub, Genshlea & Sproul, Sacramento, CA, for Appellee Tyfield Importers, Inc.

John R. Harrison, Jr., Sacramento, CA, for Third–Party Defendant George Gino Barca.

* The Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

Before: O'SCANNLAIN and TALLMAN, Circuit Judges, and KING *, District Judge.

O'SCANNLAIN, Circuit Judge.

We must decide whether a company engaged in "naked licensing" of its trademark, thus resulting in abandonment of the mark and ultimately its cancellation.

I

This case involves a dispute over who may use the "Leonardo Da Vinci" trademark for wines.

A

Barcamerica International USA Trust ("Barcamerica") traces its rights in the Leonardo Da Vinci mark to a February 14, 1984 registration granted by the United States Patent and Trademark Office ("PTO"), on an application filed in 1982.[1] On August 7, 1989, the PTO acknowledged the mark's "incontestability." *See* 15 U.S.C. § 1115(b). Barcamerica asserts that it has used the mark continuously since the early 1980s. In the district court, it produced invoices evidencing two sales per year for the years 1980 through 1993: one to a former employee and the other to a barter exchange company. Barcamerica further produced invoices evidencing between three and seven sales per year for the years 1994 through 1998. These include sales to the same former employee, two barter exchange companies, and various sales for "cash." The sales volume reflected in the invoices for the years 1980 through 1988 range from 160 to 410 cases of wine per year. Barcamerica

1. A related corporation originally obtained the registration, but assigned it in 1995 to Barcamerica.

also produced sales summaries for the years 1980 through 1996 which reflect significantly higher sales volumes; these summaries do not indicate, however, to whom the wine was sold.

In 1988, Barcamerica entered into a licensing agreement with Renaissance Vineyards ("Renaissance"). Under the agreement, Barcamerica granted Renaissance the nonexclusive right to use the "Da Vinci" mark for five years or 4,000 cases, "whichever comes first," in exchange for $2,500. The agreement contained no quality control provision. In 1989, Barcamerica and Renaissance entered into a second agreement in place of the 1988 agreement. The 1989 agreement granted Renaissance an exclusive license to use the "Da Vinci" mark in the United States for wine products or alcoholic beverages. The 1989 agreement was drafted by Barcamerica's counsel and, like the 1988 agreement, it did not contain a quality control provision.[2] In fact, the only evidence in the record of any efforts by Barcamerica to exercise "quality control" over Renaissance's wines comprised (1) Barcamerica principal George Gino Barca's testimony that he occasionally, informally tasted of the wine, and (2) Barca's testimony that he relied on

the reputation of a "world-famous winemaker" employed by Renaissance at the time the agreements were signed.[3] (That winemaker is now deceased, although the record does not indicate when he died.) Nonetheless, Barcamerica contends that Renaissance's use of the mark inures to Barcamerica's benefit. *See* 15 U.S.C. § 1055.

## B

Cantine Leonardo Da Vinci Soc. Coop. a.r.l. ("Cantine"), an entity of Italy, is a wine producer located in Vinci, Italy. Cantine has sold wine products bearing the "Leonardo Da Vinci" tradename since 1972; it selected this name and mark based on the name of its home city, Vinci. Cantine began selling its "Leonardo Da Vinci" wine to importers in the United States in 1979. Since 1996, however, Tyfield Importers, Inc. ("Tyfield") has been the exclusive United States importer and distributor of Cantine wine products bearing the "Leonardo Da Vinci" mark. During the first eighteen months after Tyfield became Cantine's exclusive importer, Cantine sold approximately 55,000 cases of wine products bearing the "Leonardo Da

---

2. In fact, the 1989 Agreement specifically states that Renaissance "shall be solely responsible for any and all claims or causes of action for negligence, breach of contract, breach of warranty, or products liability arising from the sale or distribution of Products using the Licensed Mark."

3. After the commencement of this litigation, Barcamerica proposed a new agreement to Renaissance. The proposed agreement included a quality control provision, and the letter from Barcamerica's attorney proposing this new agreement acknowledged that the agreement "addresses requirements of trademark law that the licensor maintain some control over the licensed product." Renaissance never accepted Barcamerica's invitation to enter into this new agreement. In 1999, Barcamerica again acknowledged it

had an obligation to perform quality control for the licensed product and requested that Renaissance execute a declaration stating, *inter alia*, that Barcamerica had been involved in the quality control of the licensed product. Renaissance refused to execute this declaration, because it was "neither truthful nor accurate." Indeed, in a letter to Barcamerica, Renaissance's counsel stated:

[N]ever at any time, to [Renaissance's] knowledge, has Mr. Barca ever had any involvement of any kind whatsoever regarding quality, quality control, the use of the *Da Vinci* label, or the marketing of the *Da Vinci* label wines, nor has he ever "examined" Renaissance's wine, "sampled" it, or had any involvement whatsoever regarding the quality of the wine and maintaining it at any level.

Vinci" mark to Tyfield. During this same period, Tyfield spent between $250,000 and $300,000 advertising and promoting Cantine's products, advertising in *USA Today*, and such specialty magazines as *The Wine Spectator*, *Wine and Spirits*, and *Southern Beverage Journal*.

Cantine learned of Barcamerica's registration of the "Leonardo Da Vinci" mark in or about 1996, in the course of prosecuting its first trademark application in the United States. Cantine investigated Barcamerica's use of the mark and concluded that Barcamerica was no longer selling any wine products bearing the "Leonardo Da Vinci" mark and had long since abandoned the mark. As a result, in May 1997, Cantine commenced a proceeding in the PTO seeking cancellation of Barcamerica's registration for the mark based on abandonment. Barcamerica responded by filing the instant action on January 30, 1998, and thereafter moved to suspend the proceeding in the PTO. The PTO granted Barcamerica's motion and suspended the cancellation proceeding.

■ Although Barca has been aware of Cantine's use of the "Leonardo Da Vinci" mark since approximately 1993,[4] Barcamerica initiated the instant action only after Tyfield and Cantine commenced the proceeding in the PTO. A month after Barcamerica filed the instant action, it moved for a preliminary injunction enjoining Tyfield and Cantine from any further use of the mark. The district court denied the motion, finding, among other things, that "there is a serious question as to whether [Barcamerica] will be able to demonstrate

a bona fide use of the Leonardo Da Vinci mark in the ordinary course of trade and overcome [the] claim of abandonment." *Barcamerica Int'l U.S.A. Trust v. Tyfield Importers, Inc.*, No. CV–98–00206–FCD, at 4–5 (E.D. Cal. filed Apr. 13, 2000) (Damrell, J.).

Thereafter, Tyfield and Cantine moved for summary judgment on various grounds. The district court granted the motion, concluding that Barcamerica abandoned the mark through naked licensing. The court further found that, in any event, the suit was barred by laches because Barcamerica knew several years before filing suit that Tyfield and Cantine were using the mark in connection with the sale of wine. This timely appeal followed.

## II

Before addressing the merits of this case, we must first deal with a preliminary issue raised by Tyfield and Cantine. By motion, Tyfield and Cantine ask us to strike various of Barcamerica's Excerpts of Record, and also the portions of Barcamerica's opening brief which rely on those excerpts; they also request sanctions. The documents objected to can be roughly separated into three categories: (1) portions of depositions; (2) exhibits to depositions; and (3) other documents, not part of depositions.

## A

■ As Tyfield and Cantine correctly observe, the record on appeal consists of

---

4. For the first time on appeal, Barcamerica attempts to disavow Barca's testimony, contending that Barca only learned of the allegedly infringing activity in 1996. As Tyfield and Cantine correctly point out, however, Barcamerica cannot prevail on this appeal from a grant of summary judgment by replacing unfavorable deposition testimony with the

arguments of its lawyer; the arguments and statements of counsel "are not evidence and do not create issues of material fact capable of defeating an otherwise valid motion for summary judgment." *Smith v. Mack Trucks*, 505 F.2d 1248, 1249 (9th Cir.1974) (per curiam).

"the original papers and exhibits *filed in the district court.*" Fed. R.App. P. 10(a)(1); *see also* 9th Cir. R. 10–2. Consequently, "[p]apers not filed with the district court or admitted into evidence by that court are not part of the record on appeal." *Kirshner v. Uniden Corp. of Am.,* 842 F.2d 1074, 1077 (9th Cir.1988). With respect to categories (1) and (2) more specifically, while portions of these depositions and exhibits were filed appended to the motion for summary judgment and the Barcamerica's opposition thereto—and thereby brought to the court's attention—the portions and exhibits objected to were not. Thus, these documents, which were not filed with the district court, are not properly part of the record before us. *See Henn v. Nat'l Geographic Soc.,* 819 F.2d 824, 831 (7th Cir.1987) ("Parties who designate and file parts of a deposition for a district judge's consideration must be aware that the remainder of the deposition is not in the record on appeal.").

**B**

■ Barcamerica raises several unavailing arguments in opposition to the motion to strike. Barcamerica relies primarily upon Federal Rule of Civil Procedure 32(a)(4), which provides that "[i]f only part of a deposition is offered in evidence by a party, an adverse party may require the offeror to introduce any other part which ought in fairness to be considered with the part introduced, and any party may introduce any other parts." While this is true, it has nothing to do with determining what is in the record on appeal—Barcamerica admits that these "other parts" were not, in fact, filed. Barcamerica also relies on

various Federal Rules of Evidence, most notably Rule 106, which provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Again, this Rule is irrelevant to the question of what is in the record on appeal; it only indicates that Barcamerica could have required the introduction of other parts of statements or writings "at th[e] time" when Tyfield and Cantine introduced parts of the statements or writing, i.e., before the district court. Barcamerica did not do so.

**C**

■ At oral argument, Barcamerica asserted that even if documents in category (3) were not part of the record on appeal, at least those in categories (1) and (2) are because the depositions from which they were extracted were lodged with the district court. This contention is a novel one, and appears attributable to the unique nature of the Eastern District of California's Local Rules. In many district courts, only those portions of depositions relied upon in a motion for summary judgment are filed, while the entire depositions are not. In such places, the Seventh Circuit's ruling in *Henn* is clearly correct—if a party did not file documents in support of or opposition to a motion, the district court would never have had possession of the documents.[5]

But things work differently in the Eastern District of California. The Local Rules there clearly state that "[p]rior to or upon

---

5. *See, e.g.,* D. Or. L.R. 30.1 ("Unless directed by the court, depositions will not be filed with the court, instead they will be maintained by counsel and made available to parties in accordance with Fed.R.Civ.P. 30(b)."); D. Or. L.R. 56.1(c)(3) (requiring a statement of facts

to be submitted with a motion for summary judgment, but mandating that "[d]ocuments referenced in the ... statement shall not be filed in their entirety. Instead, the filing party must extract and highlight only the relevant portions of each referenced document").

the filing of a document making reference to a deposition, it shall be the duty of the attorney relying on the deposition to ensure that the original of the deposition so relied upon has been filed or lodged with the Clerk." E.D. Cal. L.R. 30–250(a). Consequently, in that court, if any party files a part of a deposition in support of, or opposition to, summary judgment, that party must lodge or file the *entire* deposition. *See* E.D. Cal. L.R. 56 260(a), (e). In this case, Tyfield and Cantine—the proponents of the motion—actually lodged the full transcripts, including exhibits. Accordingly, Barcamerica contends that the documents in categories (1) and (2), which include documents that were lodged as parts of these depositions (either excerpts or exhibits), are properly before us even though neither party filed or specifically presented them to the district court in connection with the motion for summary judgment.

While interesting, this argument ultimately fails in this case. As Barcamerica's counsel conceded at oral argument, these depositions were not, in fact, filed with the district court, but merely lodged. Federal Rule of Appellate Procedure 10(a) indicates that only those documents that were "filed" with the district court are, in fact, part of the record on appeal. Fed. R.App. 10(a). And a leading treatise confirms that "[m]atters that were merely lodged with the clerk … are excluded from the definition" found in Rule 10(a) of what constitutes the record on appeal. 16A Wright, Miller & Cooper, Fed. Prac. & Proc. § 3956.1 (Supp.2000); *see also id.* (explaining that under Rule 10(a), "only those matters that were in fact *presented to the district court* are considered part of the record on appeal") (emphasis added).[6] We therefore grant the motion to strike these improper documents, and those portions of Barcamerica's opening brief which rely upon them. The request for sanctions, however, is denied.

## III

We now turn to the merits of the appeal. Barcamerica first challenges the district court's conclusion that Barcamerica abandoned its trademark by engaging in naked licensing. It is well-established that "[a] trademark owner may grant a license and remain protected provided quality control of the goods and services sold under the trademark by the licensee is maintained." *Moore Bus. Forms, Inc. v.*

6. We note that under the Eastern District's Local Rules the transcripts could, in fact, have been filed rather than lodged. Had the transcripts been filed, Barcamerica might have a better argument that their contents are properly before us. That they may have been properly considered part of the record on appeal, however, does not necessarily mean that Barcamerica could have relied on their contents in raising arguments before this court against the district court's grant of summary judgment. We have made clear that we generally will not consider on appeal from the grant or denial of summary judgment matters that are not first affirmatively brought to the attention of the district court. *United States v. Carlson,* 900 F.2d 1346, 1349 (9th Cir.1990) ("Our general rule is that we will not consider issues raised for the first time on appeal

…."); *cf. Carmen v. San Francisco Unif. Sch. Dist.,* 237 F.3d 1026, 1030 (9th Cir.2001) ("A substantial number of cases have records that fill a drawer or two of a filing cabinet, and some big cases sometimes fill multiple five-drawer file cabinets in the clerks' offices. A lawyer drafting an opposition to a summary judgment motion may easily show a judge, in the opposition, the evidence that the lawyer wants the judge to read. It is absurdly difficult for a judge to perform a search, unassisted by counsel, through the entire record, to look for such evidence.").

Because the transcripts were merely lodged, however, it is clear that they are not part of the record on appeal. We therefore leave to another day the question of what effect their filing might have had on the propriety of our considering their contents.

*Ryu*, 960 F.2d 486, 489 (5th Cir.1992). But "[u]ncontrolled or 'naked' licensing may result in the trademark ceasing to function as a symbol of quality and controlled source." *McCarthy on Trademarks and Unfair Competition* § 18:48, at 18–79 (4th ed.2001). Consequently, where the licensor fails to exercise adequate quality control over the licensee, "a court may find that the trademark owner has abandoned the trademark, in which case the owner would be estopped from asserting rights to the trademark." *Moore*, 960 F.2d at 489. Such abandonment "is purely an 'involuntary' forfeiture of trademark rights," for it need not be shown that the trademark owner had any subjective intent to abandon the mark. *McCarthy* § 18:48, at 18–79. Accordingly, the proponent of a naked license theory "faces a stringent standard" of proof. *Moore*, 960 F.2d at 489.

## A

■■■■ Judge Damrell's analysis of this issue in his memorandum opinion and order is correct and well-stated, and we adopt it as our own. As that court explained,

> In 1988, [Barcamerica] entered into an agreement with Renaissance in which [Barcamerica] granted Renaissance the non-exclusive right to use the "Da Vinci" mark for five years or 4,000 cases, "whichever comes first." There is no quality control provision in that agreement. In 1989, [Barcamerica] and Renaissance entered into a second agreement in place of the 1998 agreement. The 1989 agreement grants Renaissance an exclusive license to use the "Da Vinci" mark in the United States for wine products or alcoholic beverages. The 1989 agreement was to "continue in effect in perpetuity," unless terminated in accordance with the provisions thereof.

> The 1989 agreement does not contain any controls or restrictions with respect to the quality of goods bearing the "Da Vinci" mark. Rather, the agreement provides that Renaissance is "solely responsible for any and all claims or causes of action for negligence, breach of contract, breach of warranty, or products liability arising from the sale or distribution of Products using the Licensed Mark" and that Renaissance shall defend and indemnify plaintiff against such claims.

> The lack of an express contract right to inspect and supervise a licensee's operations is not conclusive evidence of lack of control. "[T]here need not be formal quality control where 'the particular circumstances of the licensing arrangement [indicate] that the public will not be deceived.'" *Moore Bus. Forms, Inc.*, 960 F.2d at 489 (quoting *Taco Cabana Int'l, Inc.* [*v. Two Pesos, Inc.*, 932 F.2d 1113, 1121 (5th Cir.1991)] ). Indeed, "[c]ourts have upheld licensing agreements where the licensor is familiar with and relies upon the licensee's own efforts to control quality." *Morgan Creek Prods., Inc. v. Capital Cities/ABC, Inc.*, 22 U.S.P.Q.2d 1881, 1884, 1991 WL 352619 (C.D.Cal.1991) (citing *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1017–18 (9th Cir.1985)).

> Here, there is no evidence that [Barcamerica] is familiar with or relied upon Renaissance's efforts to control quality. Mr. Barca represents that Renaissance's use of the mark is "controlled by" plaintiff "with respect to the nature and quality of the wine sold under the license," and that "[t]he nature and quality of Renaissance wine sold under the trademark is good." [Barcamerica]'s sole evidence of any such control is Mr. Barca's own apparently random tastings and his reliance on Renaissance's reputation. According to Mr. Barca, the quality of

Renaissance's wine is "good" and at the time plaintiff began licensing the mark to Renaissance, Renaissance's winemaker was Karl Werner, a "world famous" winemaker.

Mr. Barca's conclusory statements as to the existence of quality controls is insufficient to create a triable issue of fact on the issue of naked licensing. While Mr. Barca's tastings perhaps demonstrate a minimal effort to monitor quality, Mr. Barca fails to state when, how often, and under what circumstances he tastes the wine. Mr. Barca's reliance on the reputation of the winemaker is no longer justified as he is deceased. Mr. Barca has not provided any information concerning the successor winemaker(s). While Renaissance's attorney, Mr. Goldman, testified that Renaissance "strive[s] extremely hard to have the highest possible standards," he has no knowledge of the quality control procedures utilized by Renaissance with regard to testing wine. Moreover, according to Renaissance, Mr. Barca never "had any involvement whatsoever regarding the quality of the wine and maintaining it at any level." [Barcamerica] has failed to demonstrate any knowledge of or reliance on the actual quality controls used by Renaissance, nor has it demonstrated any ongoing effort to monitor quality.

[Barcamerica] and Renaissance did not and do not have the type of close working relationship required to establish adequate quality control in the absence of a formal agreement. *See, e.g., Taco Cabana Int'l, Inc.,* 932 F.2d at 1121 (licensor and licensee enjoyed close working relationship for eight years); *Transgo,* 768 F.2d at 1017–18 (licensor manufactured 90% of components sold

by licensee, licensor informed licensee that if he chose to use his own parts "[licensee] wanted to know about it," licensor had ten year association with licensee and was familiar with his ability and expertise); *Taffy Original Designs, Inc. v. Taffy's Inc.,* 161 U.S.P.Q. 707, 713 (N.D.Ill.1966) (licensor and licensee were sisters in business together for seventeen years, licensee's business was a continuation of the licensor's and licensee's prior business, licensor visited licensee's store from time to time and was satisfied with the quality of the merchandise offered); *Arner v. Sharper Image Corp.,* 39 U.S.P.Q.2d 1282, 1995 WL 873730 (C.D.Cal.1995) (licensor engaged in a close working relationship with licensee's employees and license agreement provided that license would terminate if certain employees ceased to be affiliated with licensee). No such familiarity or close working relationship ever existed between [Barcamerica] and Renaissance. Both the terms of the licensing agreements and the manner in which they were carried out show that [Barcamerica] engaged in naked licensing of the "Leonardo Da Vinci" mark. Accordingly, [Barcamerica] is estopped from asserting any rights in the mark.

*Barcamerica,* No. CV–98–00206–FCD, at 9–13 (E.D.Cal. filed Apr.13, 2000) (record citations and footnote omitted).

## B

On appeal, Barcamerica does not seriously contest any of the foregoing. Instead, it argues essentially that because Renaissance makes good wine, the public is not deceived by Renaissance's use of the "Da Vinci" mark, and thus, that the license was legally acceptable. This novel rationale, however, is faulty.[7] Whether Renais-

---

7. Indeed, it might aptly be described as "bad wine of recent vintage." *TRW Inc. v. An-*

*drews,* 534 U.S. 19, 122 S.Ct. 441, 452, 151 L.Ed.2d 339 (2001) (Scalia, J., concurring).

sance's wine was objectively "good" or "bad" is simply irrelevant. What matters is that Barcamerica played no meaningful role in holding the wine to a standard of quality—good, bad, or otherwise. As McCarthy explains,

> It is important to keep in mind that "quality control" does not necessarily mean that the licensed goods or services must be of "high" quality, but merely of equal quality, whether that quality is high, low or middle. *The point is that customers are entitled to assume that the nature and quality of goods and services sold under the mark at all licensed outlets will be consistent and predictable.*

*McCarthy* § 18:55, at 18–94 (emphasis added) (footnotes omitted). And "it is well established that where a trademark owner engages in naked licensing, without any control over the quality of goods produced by the licensee, such a practice is *inherently deceptive* and constitutes abandonment of any rights to the trademark by the licensor." *First Interstate Bancorp v. Stenquist*, 16 U.S.P.Q.2d 1704, 1706, 1990 WL 300321 (N.D.Cal.1990).

 Certainly, "[i]t is difficult, if not impossible to define in the abstract exactly how much control and inspection is needed to satisfy the requirement of quality control over trademark licensees." *McCarthy*, § 18:55, at 18–94. And we recognize that "[t]he standard of quality control and the degree of necessary inspection and policing by the licensor will vary with the wide range of licensing situations in use in the modern marketplace." *Id.*, at 18–95. But in this case we deal with a relatively simple product: wine. Wine, of course, is bottled by season. Thus, at the very least, one might have expected Barca to sample (or to have some designated wine connoisseur sample) on an annual basis, in some organized way, some adequate number of bottles of the Renaissance wines which were to bear Barcamerica's mark to ensure that they were of sufficient quality to be called "Da Vinci." But Barca did not make even this minimal effort.

### C

We therefore agree with Judge Damrell, and hold that Barcamerica engaged in naked licensing of its "Leonardo Da Vinci" mark—and that by so doing, Barcamerica forfeited its rights in the mark. We also agree that cancellation of Barcamerica's registration of the mark was appropriate. *See McCarthy* § 18:48, at 18–82 (explaining that " 'naked' licensing can result in such a loss of significance of a trademark that its federal registration should be cancelled").[8]

### IV

For the foregoing reasons, the decision of the district court is

**AFFIRMED.**

---

**8.** Because we conclude that Barcamerica's naked licensing of the mark is a sufficient ground to support the district court's grant of summary judgment to Tyfield and Cantine on Barcamerica's claims, and the district court's cancellation of Barcamerica's registration, we need not consider the district court's alternative holding that Barcamerica's claims are barred by the doctrine of laches.