**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DEPARTMENT OF PARKS AND
RECREATION FOR THE STATE OF
CALIFORNIA,
            *Plaintiff-Appellant,*

v.

BAZAAR DEL MUNDO INC., a
California Corporation,
            *Defendant-Appellee.*

No. 05-55828

D.C. No.
CV-04-02244-JTM

OPINION

Appeal from the United States District Court
for the Southern District of California
Jeffrey T. Miller, District Judge, Presiding

Argued and Submitted
December 7, 2005—Pasadena, California

Filed May 24, 2006

Before: Robert R. Beezer, Cynthia Holcomb Hall, and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Wardlaw

5679

## COUNSEL

Richard P. Sybert, San Diego, California, for the plaintiff-appellant.

John T. Brooks, San Diego, California, for the defendant-appellee.

## OPINION

WARDLAW, Circuit Judge:

The Department of Parks and Recreation for the State of California (the "State") appeals the denial of its motion to preliminarily enjoin Bazaar del Mundo from using the registered trademarks CASA DE BANDINI and CASA DE PICO in the operation of restaurants located outside the boundaries of the Old Town San Diego State Historic Park ("Old Town"). The critical issue in dispute is whether the State owns any protectible interest in the trademarks. Because we agree with the district court that the State failed to introduce sufficient evidence of ownership of the marks and thereby failed to establish the requisite degree of likelihood of success on the merits, we affirm the district court's denial of injunctive relief.

## I.

In 1968, the State of California acquired title to about fourteen acres of land by condemnation judgment in order to establish Old Town. The sale included the Casa de Pico and Casa de Bandini properties, which were both built in the 1820s. Each building has a rich history: Casa de Pico was built by Pio Pico, the last Mexican governor of California, while Casa de Bandini was built by a Peruvian immigrant of Italian descent who became a prominent San Diegan, Don Juan Bandini. Before the State acquired the property, the Casa de Pico building was operated as the "Casa de Pico Motel," while the Casa de Bandini house was operated as a hotel and stage coach station, which included a restaurant. Afterwards, the buildings were used to house shops and, in 1969, the Casa de Bandini house served as the headquarters for the Fiesta 200

celebration of San Diego's bicentennial. In conjunction with the Fiesta 200 festival, the State produced a brochure which mentioned the Pico and Bandini families. Casa de Bandini was registered as a California Historical Landmark in 1932.

On June 21, 1971, the State and Bazaar del Mundo entered into a "Concession Agreement." The Agreement provided that the State grant Bazaar del Mundo the "privilege and duty" to construct or modify, equip, operate and maintain a Mexican-Style Shopping Arcade in the Casa de Pico Buildings in Old Town for a five-year period, in return for rent and a percentage of receipts. The Agreement was amended several times. In 1972, Bazaar del Mundo was permitted to extend its concession activities into the "Bandini House — Cosmopolitan Hotel," and the Agreement was extended five years. In 1981, the parties executed Amendment Three, which stipulated that the "subject premises shall be used by the Concessionaire to establish a Mexican Shopping Arcade, Lino's, Hamburguesa, Casa de Pico, and the Casa de Bandini Restaurants," and extended the Agreement another ten years. When the third amendment was executed on November 18, 1981, Bazaar del Mundo had been operating its Casa de Pico restaurant for ten years and its Casa de Bandini restaurant for one year. In 1991, Bazaar del Mundo exercised its option to extend the term of the Concession Agreement for ten more years.

Before the Agreement was to expire, on June 30, 2001, the State initiated an open bidding process for the next concession agreement. In connection with its Request for Proposals, the State prepared a Sample Contract containing a provision that would govern intellectual property rights. Objecting to the intellectual property rights provision, Bazaar del Mundo nevertheless submitted a bid for the concession. On October 17, 2003, the State issued a "Notice of Intent to Award" the concession to Delaware North, Inc., a Delaware corporation. Bazaar del Mundo submitted to the State a "Protest of Bid Award" on October 27, 2003, commencing a state administrative review process. The State allowed Bazaar del Mundo to

continue operating as a holdover tenant in Old Town during the pendency of its administrative appeal. During this time, Bazaar del Mundo also filed a federal trademark infringement action in the Southern District of California against Delaware North and Ruth Coleman, the Director of the State Department of Parks and Recreation. The district court dismissed that action on March 3, 2004, finding that (1) the Eleventh Amendment barred suit against Director Coleman; (2) the case was not yet ripe for adjudication; and (3) Bazaar del Mundo had failed to exhaust its administrative remedies.

On July 12, 2004, an Administrative Law Judge ("ALJ") denied Bazaar del Mundo's administrative bid protest. Director Coleman adopted the ALJ's decision on July 23, 2004. Bazaar del Mundo petitioned for a writ of mandate to review the decision before the San Diego Superior Court on January 20, 2005, but the petition was denied. The State issued a "Notice to Vacate" the premises effective March 15, 2005. Delaware North took over the concession on June 1, 2005.

Previously, in 1985, Bazaar del Mundo applied to the United States Patent and Trademark Office ("USPTO") and the Secretary of the State of California, to register the trademarks CASA DE PICO, CASA DE BANDINI, LINO'S, and HAMGURGUESA for restaurant services. The trademarks were published and received no opposition. The USPTO granted federal registration to Bazaar del Mundo for the mark CASA DE BANDINI on July 16, 1985 and for the mark CASA DE PICO on October 8, 1985. In its application, Bazaar del Mundo distinguished the terms "Pico Pollo" and "Pico de Gallo" from CASA DE PICO, representing that "[t]he Pico in Bazaar del Mundo's mark refers not to an animal but to General Pio Pico, the last Mexican governor." Bazaar del Mundo went on to state that "[t]he site on which the restaurant stands was the home of General Pico which was later converted into a motel in 1930 . . . [and] subsequently converted into a restaurant."

In May 2005, after it had vacated its Old Town location, Bazaar del Mundo announced its plans to open restaurants under the names "Casa de Pico Restaurant" and "Casa de Bandini Restaurant" in La Mesa, California and on the water-front in downtown San Diego. This announcement prompted the State to file this action against Bazaar del Mundo, seeking (1) declaratory judgment of trademark ownership under California Code of Civil Procedure § 1060; (2) rectification of the trademark registry under 15 U.S.C. § 1119; and damages for (3) common law trademark infringement; (4) fraudulent federal trademark infringement under 15 U.S.C. § 1120; (5) unfair competition under California Business and Professions Code § 17200; (6) false advertising under California Business and Professions Code § 17500; and (7) false designation of origin under 15 U.S.C. § 1125.

To prevent Bazaar del Mundo from using the marks in connection with its new restaurants, the State moved for a preliminary injunction. Bazaar del Mundo responded by filing a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The district court denied both motions by Order dated May 17, 2005. Only the State appeals the district court's ruling. The district court found, based on the state of the record at that time, that the State failed to demonstrate a protectible trademark interest in the marks so as to demonstrate a sufficient probability of success on the merits warranting injunctive relief.

## II.

We review a district court's denial of injunctive relief for an abuse of discretion. *See Hecht Co. v. Bowles*, 321 U.S. 321, 331 (1944); *Petroleum Exploration, Inc. v. Pub. Serv. Comm'n*, 304 U.S. 209, 218 (1938). We review the district court's findings of fact for clear error, *see Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1239 (9th Cir. 2001), and the district court's conclusions of law de novo, *see Brown v. Cal. Dep't of Transp.*, 321 F.3d 1217, 1221 (9th Cir. 2003).

### III.

**[1]** To obtain injunctive relief, the movant must demonstrate either: (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) that serious questions are raised as to the merits and that the balance of hardships tips in its favor. *Arcamuzi v. Cont'l Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir. 1987); *see also Sardi's Rest. Corp. v. Sardie,* 755 F.2d 719, 723 (9th Cir. 1985) (applying test in a trademark case).

The district court both articulated and applied the correct legal standard to the State's request for an injunction against Bazaar del Mundo's use of the CASA DE PICO and CASA DE BANDINI marks. Quoting *Arcamuzi*, 819 F.2d at 937, the district court set forth the two tests, noting that " '[t]hese two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.' " The district court also recognized that under both formulations of the test, the party seeking injunctive relief must demonstrate a "fair chance of success on the merits" and a "significant threat of irreparable injury." And, as we also held in *Arcamuzi*, "[i]f the plaintiff shows no chance of success on the merits, . . . the injunction should not issue," because "[a]s an irreducible minimum, the moving party must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation." *Arcamuzi*, 819 F.2d at 937 (internal quotation marks omitted). The district court also noted that if the public interest is implicated, that, too, must be considered as a factor.

Conceding, as it must, that the district court articulated the correct legal standards, the State nevertheless insists that it failed to correctly apply them to this case. Specifically, it contends that the district court applied the wrong "likelihood of success" standard because of the "presence of significant issues of public importance" tipping the balance of hardships sharply in the State's favor. The State's assertion, however,

confuses the analysis of the "success" factor with the "harm" factor.

**[2]** Although we "must consider the public interest as a factor in balancing the hardships when the public interest may be affected," *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988), the district court never reached this end of the sliding scale, because the State failed to demonstrate any chance of success on the merits on the evidentiary record before it. The State failed to adduce any evidence tending to demonstrate that, as a matter of intellectual property law, it held a protectible ownership interest in the trademarks. Therefore, the public interest is not a factor that the district court needed to weigh at this stage.

Nor was the district court required to issue an injunction to restore the "status quo." While the "basic function of a preliminary injunction is to preserve the status quo pending a determination of the action on the merits," *Chalk v. United States District Court*, 840 F.2d 701, 704 (9th Cir. 1988), the status quo is not simply any situation before the filing of the lawsuit, but rather the last uncontested status that preceded the parties' controversy. *GoTo.Com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000). The parties dispute what the "status quo" is. Without the State adducing sufficient evidence of ownership of the marks, and in view of the registration and continued use of the marks by Bazaar del Mundo, we cannot say that the district court abused its discretion in declining to enjoin Bazaar del Mundo's use of the marks to preserve the status quo.

## IV.

To prevail on its claim of trademark infringement, the State must prove: (1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion, thereby infringing upon the State's rights to the mark. *Levi Strauss & Co. v. Blue Bell*,

*Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985) (en banc). Bazaar del Mundo's federal registration of the marks is prima facie evidence of its ownership of the marks. *See* 15 U.S.C. § 1057(b); 15 U.S.C. § 1115(a)*; Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219, *as modified*, 97 F.3d 1460 (9th Cir. 1996). The State, however, may rebut the presumption of ownership with evidence establishing its own prior use in commerce of the registered mark. *Id.* at 1220. The State argues that it acquired ownership of the marks before Bazaar del Mundo registered them in two ways: (1) through the common law by its prior use of the marks in connection with the tourism and recreation services it provided in Old Town before the Concession Agreement;[1] and (2) through the Concession Agreement itself, in which it claims it granted a license to Bazaar del Mundo to use the marks, from which we might infer the State's ownership of them. The State further asserts that the district court abused its discretion by ignoring potential misrepresentation to the public under section 2(d) of the Lanham Act, 15 U.S.C. § 1052, due to the likelihood of confusion which would result if Bazaar del Mundo were to use the marks beyond Old Town.

## A.

The district court correctly found that the State could not demonstrate common law trademark rights based on its asserted prior use of the marks in connection with the operation of the state park and its provision of tourism services from 1968 to 1971, a time period immediately preceding the Concession Agreement. Because the State failed in its attempt to establish a protectible common law interest in its use of the marks for those purposes, the district court properly rejected the State's argument that the marks extended to related services, such as restaurants.

---

[1]On appeal, the State abandoned its claim of ownership of the marks based solely upon its ownership of the Casa de Pico and Casa de Bandini historic buildings, which was correctly rejected by the district court.

**[3]** The State first incorrectly contends that it need not demonstrate prior use at all, relying on its own misapprehension of section 5 of the Lanham Act, codified at 15 U.S.C. § 1055. Section 5 provides:

> If first use of a mark by a person is controlled by the registrant or applicant for registration of the mark with respect to the nature and quality of the goods or services, such first use shall inure to the benefit of the registrant or applicant, as the case may be.

Section 5, however, is not remotely relevant to the State's circumstances. First, section 5 by its plain terms applies only to first use by a person "controlled by the registrant or applicant for registration." The State is neither. Second, the State quotes a passage that was added to section 5 in 1988, which functioned only to permit an applicant to "reserve" a mark before commencing use of the mark in its business. *See* 1988 Amendments to Lanham Act, Pub.L. 100-667 (S. 1883); 3 McCarthy on Trademarks and Unfair Competition § 19:1.1 (4th ed. 2005). Registration under the Lanham Act has no effect on the registrant's rights under the common law, which requires a mark to have been used in commerce before a protectible ownership interest in the mark arises. *See Kellog Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 117 n.3 (1938); *Cal. Cooler v. Loretta Winery, Ltd.*, 774 F.2d 1451, 1454 (9th Cir. 1985). "To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Sengoku Works Ltd.*, 96 F.3d at 1219; *see also* 3 McCarthy § 19:1.1 at 19-12.

Next the State asserts that the district court incorrectly assessed the character and extent of the State's prior commercial use of the marks when it concluded that the State failed to introduce sufficient evidence of such use. We disagree. The

district court correctly found that the "evidence" submitted by the State did not demonstrate actual commercial use.

**[4]** To demonstrate priority of use, the State must prove (1) that it actually adopted and used the marks in commerce prior to Bazaar del Mundo's registration in such a manner that sufficiently associated the marks with the State's provision of tourism and recreational services, *Chance v. Pac-Tel Teletrac*, 242 F.3d 1151, 1158 (9th Cir. 2001); *New West Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1200 (9th Cir. 1979); and (2) that its use of the marks was continuous and not interrupted, *Pac-Tel Teletrac Inc.*, 242 F.3d at 1157; *Casual Corner Assocs., Inc. v. Casual Stores of Nev., Inc.*, 493 F.2d 709, 711-12 (9th Cir. 1974). "[O]wnership of a mark requires both appropriation and use in trade; and [ ]ownership of a mark and the exclusive right to a mark belongs to the one who first uses the mark on goods placed on the market." *Pac-Tel Teletrac Inc.*, 242 F.3d at 1157 (internal quotation marks omitted and alteration in original). While the first use need not be extensive, the use must be bona fide and commercial in character:

> [A] single sale or shipment may be sufficient to support an application to register the mark, providing that this shipment or sale has the color of a bona fide transaction and is accompanied or followed by activities which would tend to indicate a continuing effort or intent to continue such use and place the product on the market on a commercial scale within a time demonstrated to be reasonable in the particular trade.

*Id.* (citing *Hydro-Dynamics, Inc. v. George Putnam & Co.*, 811 F.2d 1470, 1472-74 (Fed. Cir. 1987)). The State cannot rely on a few instances of use of the marks in the distant past that were "casual" or had "little importance apparently attached to [them]." *Menendez v. Holt*, 128 U.S. 514, 521 (1888); *also* 2 McCarthy on Trademarks § 16:9 at 16-18. To the contrary, the litigant attempting to establish priority of

commercial use must demonstrate both adoption of the marks and " '[u]se in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.' " *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1052 (9th Cir. 1999) (alteration in original) (quoting *New West Corp.*, 595 F.2d at 1200). "Although mere advertising by itself may not establish priority of use," *New West Corp.*, 595 F.2d at 1200, advertising combined with other non-sales activity, under our "totality of the circumstances test," *Pac-Tel Teletrac*, 242 F.3d at 1158, can constitute prior use in commerce.

It is not disputed that the State has offered tourism and recreational services since Old Town was classified as a State Historical Park in 1968. The State, however, offers no evidence tending to show that it adopted and commercially used the marks CASA DE PICO and CASA DE BANDINI "in a way sufficiently public to identify or distinguish" its recreational and tourism services "in an appropriate segment of the public mind" as activities conducted by the State. *Brookfield*, 174 F.3d at 1052; *see also Pac-Tel Teletrac*, 242 F.3d at 1159.

**[5]** The State offers numerous documents, predominantly historical and narrative in nature, in an effort to demonstrate prior commercial use. These include books, brochures, and guides entitled, *inter alia*, "An Armchair Tour of San Diego," "The Journal of San Diego History," "Tour Guide to Old Town," excerpts from *The History of San Diego 1542-1908* by William E. Smythe, *Places at Old Town San Diego* by Orion M. Zink, and *Silver Dons-The History of San Diego*, by Richard F. Pourade. Although due to their historical significance, the Bandini and Pico families, names and homes are described in most if not all of these books, brochures and guides, they are not evidence of commercial use of the marks by the State in connection with the State's Old Town tourism and recreational activities. Indeed, much of this evidence con-

tains historical data that predates the State's acquisition of Old Town.

The State points to one brochure advertising the 1969 Fiesta 200 Celebration as an example of prior commercial use. Entitled "Old Town San Diego - State Historic Park," the brochure celebrates Old Town's bicentennial dating from 1769 to 1969. The brochure primarily describes the park and its first families, mentioning Juan Bandini and Pio Pico as part of Old Town's upper class and identifying the location of the Bandini house, headquarters for the Bicentennial, on an Old Town map. The State also submitted a brochure entitled "Old Town San Diego - State Historic Park," which also recites the history of San Diego and the growth of Old Town, identifies Bazaar Del Mundo on a map of the park and mentions, again in passing, Casa de Bandini and Juan Bandini. Neither of these brochures uses the marks in relation to the State's provision of recreational or tourism services. Indeed, neither of them even uses the contested marks at all.

**[6]** Morever, the State introduced no evidence about the length of time the Casa de Bandini building was used to house the Fiesta 200 shops, whether the brochures were provided to visitors, how many brochures were provided, whether any sales activity was conducted using the marks, or whether the State continued to conduct advertising or non-sales activity under the marks after the Fiesta 200 celebration. Because neither of the brochures was designed to attract the attention of the viewer to the marks themselves, they fail to create any association between the marks and the tourism and recreation services provided by the Department of Parks. *See Pac-Tel Teletrac*, 242 F.3d at 1159; *New West Corp.*, 595 F.2d at 1200. Introduction of these two brochures, without any evidence of sales activity and extent of distribution, falls far short of what is required to establish genuine prior commercial use. *Cf. Pac-Tel Teletrac*, 242 F.3d at 1159 (while some evidence of commercial intent found, no priority of use was established where plaintiff mailed 35,000 post cards, generat-

ing 128 responses to its 800 number, but no sales); *New West Corp.*, 595 F.2d at 1200 (priority of use established where 430,000 copies of magazine were circulated and 13,500 subscriptions were received).

The State's failure to establish continuous use of the marks in commerce also undermines its claim to ownership by virtue of its alleged prior use of the marks. *See Pac-Tel Teletrac*, 242 F.3d at 1159; *Casual Corner Assocs., Inc.*, 493 F.2d at 712. If the State in fact used the marks in commerce at the Fiesta 200 celebration more than thirty-five years ago, that use was merely transitory. The State does not assert any commercial use of the marks after the 1969 event. Bazaar del Mundo began making continuous commercial use of the marks CASA DE PICO and CASA DE BANDINI in 1971 and 1980, respectively. Thus, even had the State acquired seniority of use at one time, its failure to continue to use the marks in commerce would have allowed Bazaar del Mundo as a junior user to acquire priority. *See Casual Corner Assoc., Inc.*, 493 F.2d at 712.

Even were the State able to establish prior commercial use, because the trademarks are descriptive, *i.e.,* based on their geographic and historical origin, *see* 15 U.S.C. § 1052(e), the State would not be entitled to trademark protection unless it were able to establish that the marks "acquired secondary meaning, *i.e.*, it 'has become distinctive of the applicant's goods in commerce.' " *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985) (quoting 15 U.S.C. §§ 1052(e), (f)); *see* 15 U.S.C. § 1052(f) (requiring five years of continuous and exclusive use to establish prima facie evidence of the development of secondary meaning of descriptive marks). "The test of secondary meaning is the effectiveness of the effort to create it, and the chief inquiry is directed towards the consumer's attitude about the mark in question: does it denote to him a single thing coming from a single source?" *Carter-Wallace, Inc. v. Proctor & Gamble*

*Co.,* 434 F.2d 794, 802 (9th Cir. 1970) (internal quotation marks omitted).

To determine whether a descriptive mark has acquired secondary meaning, we consider: " '(1) whether actual purchasers of the product bearing the claimed trademark associate the trademark with the producer, (2) the degree and manner of advertising under the claimed trademark, (3) the length and manner of use of the claimed trademark, and (4) whether use of the claimed trademark has been exclusive.' " *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 930 (9th Cir. 2005) (quoting *Levi Strauss*, 778 F.2d at 1358).

**[7]** The State failed to meet its burden of demonstrating that by virtue of its prior commercial use of the marks CASA DE PICO and CASA DE BANDINI, if any, they acquired a secondary meaning. The State failed to demonstrate that advertising it may have conducted was "of a nature and extent such as to create an association of the term with the user's goods," rather than the restaurant services of Bazaar del Mundo. *Malcolm Nicol & Co. v. Witco Corp.*, 881 F.2d 1063, 1065 (Fed. Cir. 1989) (quoting 1 McCarthy on Trademarks and Unfair Competition § 20:4 at 1025-26 (2d ed. 1984)). We agree with the district court that the State presented no evidence (i) of the length and manner of its use of the marks CASA DE BANDINI and CASA DE PICO in relation to its provision of tourism services; (ii) no evidence of the extent and degree to which brochures were printed and distributed; (iii) no evidence of any other advertising or promotional efforts taken to promote the services and/or sale of goods at the Casa de Bandini and Casa de Pico locations designed to associate the marks with the State's services; and (iv) no consumer survey or other evidence of consumer opinion, beliefs, or associations. Therefore, the State failed to introduce sufficient evidence that it has created an association in the consumer's mind between the marks and a single service, recreational and

tourism services, coming from a single source, the State. *Carter-Wallace,* 434 F.2d at 802.

## B.

Having failed to demonstrate ownership of the marks through evidence of prior use, the State asserts that the Concession Agreement operated as a trademark licensing agreement as a matter of law. Of course, even if the Concession Agreement were to be so construed, at most it would show that the State purported to license trademarks in the Concession Agreement, not that it necessarily owned the rights to do so. In any event, we agree with the district court's finding that the Concession Agreement neither expressly nor impliedly granted Bazaar del Mundo a license to use the marks. Nor did the parties' course of conduct surrounding the agreement indicate that the State had licensed marks it owned to Bazaar del Mundo. Therefore, contrary to the State's claim, Bazaar del Mundo's commercial use of the marks for restaurant services did not inure to the benefit of the State. Because the Concession Agreement is silent on the topic of intellectual property rights, it does not expressly license any such rights to Bazaar del Mundo. The State nevertheless refers us to Paragraph One of the Concession Agreement and to certain language in Amendment 3, which reference the names of the restaurants and the locations of the concessions. Paragraph One provides:

> 1.    GRANT AND DESCRIPTION OF PREMISES:
> . . . The concession shall be located in the premises provided by State and known as the Casa de Pico Buildings, Old Town San Diego State Historic Park, at 2754 Calhoun Street, in the City and County of San Diego, State of California, and being a portion of Lot 1 all of Lot 2, Block 426 of Old San Diego
> . . . .

There is obviously no mention of trademark rights in the name CASA DE PICO.

**[8]** Similarly, Amendment 3, paragraphs One and Ten, grant the rights to use the buildings for limited purposes:

> 1.  GRANT AND DESCRIPTION OF PREMISES: The State . . . grants to Concessionaire the right, privilege and duty to construct or modify, equip, operate and maintain a Mexican-style Shopping Arcade together with the Casa de Pico, Lino's, Hamburguesa and Casa de Bandini Restaurants. . . . The concession shall be located in the premises . . . known as the Casa de Pico Building, . . . and the Casa de Bandini . . . .
>
> 10.  USE OF PREMISES: The subject premises shall be used by the Concessionaire to establish a Mexican Shopping Arcade, Lino's, Hamburguesa, Casa de Pico, and the Casa de Bandini Restaurants . . . .

Thus a plain reading of the Concession Agreement reveals that it is nothing more than a standard leasing arrangement. It does not even purport to convey a license to use the marks. The State itself prepared a Sample Contract containing a provision for the use of intellectual property in connection with its Request for Proposals for Bazaar del Mundo's successor concessionaire, an acknowledgment that the prior Concession Agreement with Bazaar del Mundo did not similarly license use of the marks.

Unlike in the typical implied licensing case, here the State asserts the doctrine of implied license as evidence of its ownership of the marks, as opposed to as a defense to an infringement action. Although this is an unusual context, the State is correct that an implied license to use a trademark for certain services may arise. *See Secular Orgs. for Sobriety, Inc. v. Ullrich*, 213 F.3d 1125, 1131 (9th Cir. 2000). None arose here, however, either from the parties' mutual intentions, course of dealing, or the minimal quality-control provisions in the Con-

cession Agreement as urged by the State. As the Federal Circuit has explained:

> In most instances under contract law, a patent or trademark owner intentionally creates an express license . . . .
>
> In some circumstances, however, the entire course of conduct between a patent or trademark owner and an accused infringer may create an implied license.
>
> . . .
>
> This implied license does not offend the protection afforded patent and trademark rights by federal law.

*McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 920, 922 (Fed. Cir. 1995), *cert. denied*, 516 U.S. 1174 (1996). The Supreme Court has long recognized that a license may arise absent "a formal granting." *See De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236, 241 (1927). In *De Forest*, the Court found an implied license granted by the American Telephone & Telegraph Company to the United States to make and use patented audions. The license stemmed both from American Telephone & Telegraph Company's agreement that it would not do anything to interfere with the United States' manufacture of audions, and from its subsequent conduct. The Court held:

> Any language used by the owner of the patent or any conduct on his part exhibited to another, from which that other may properly infer that the owner consents to his use of the patent . . . constitutes a license . . . .

*Id.* Licenses are contracts "governed by ordinary principles of state contract law." *Power Lift, Inc. v. Weatherford Nipple-Up Systems, Inc.*, 871 F.2d 1082, 1085 (Fed. Cir. 1989). The State

cannot demonstrate an implied licensing agreement because it failed to introduce any evidence of an agreement or course of conduct by the parties to contract for a trademark license.

[9] The clear intent of the parties as evidenced by the Concession Agreement itself was solely to lease premises—not to license trademarks. The Agreement's terms are at odds with the State's contorted effort to remake it as a trademark licensing agreement. The Agreement describes its purpose as "grant[ing] to Concessionaire the right, privilege and duty to construct or modify, equip, operate, and maintain a Mexican-style Shopping Arcade." None of the terms typical of a trademark licensing agreement, such as payment of royalties, are present. To the contrary: the only payments to be made are labeled and structured as rental payments. The termination clauses do not provide for the surrender of intellectual property at the expiration of the contract, but rather state only that the concessionaire should quit the premises, surrender real property improvements, and execute a quitclaim deed. Similarly, the Agreement does not provide that the State retains title to any intellectual property developed during its term; the only provision for title requires Bazaar del Mundo to acknowledge the State's title to the premises described in the contract and to any improvements made to the real property.

Nor do any of the subsequent amendments reveal any intent to enter into a trademark licensing agreement. The preamble to Amendment One reiterates that the purpose of the concession was the "installation of a Mexican-style shopping arcade." Amendment Two is silent on licensing. Amendment Three contains a renewal rent calculation provision that is not based upon the good will or market value of the trademarks, but rather was to be established based upon "a survey of then-current rental practices and rents and other lease terms established by governmental agencies and private owners for comparable commercial space on a statewide basis," taking "into account local rental rates and other lease terms in the San Diego area."

Nor did the subsequent course of dealing between the parties create an implied license to use the marks. Far from it: that Bazaar del Mundo felt free to register and publish the marks with the USPTO and the California Secretary of State belies any mutual agreement to a licensing arrangement. Moreover, the State's intellectual property rights provision in the 2001 proposed new concession contract demonstrates its understanding that the old Concession Agreement did not impliedly grant a license to the marks. The new contract expressly recognizes the State's ownership of any marks developed by the concessionaire through its own goodwill during the term of the agreement:

> 28.    INTELLECTUAL PROPERTY RIGHTS: Any names, logos, trademarks and/or copyrights developed during and/or pursuant to this contract which will in any way associate with, identify or implicate an affiliation with California State Parks, shall be approved by State, shall belong to State upon creation, and shall continue in State's exclusive ownership upon termination of this contract.

Furthermore, upon learning of the proposal for the new intellectual property rights provision in the proposed concession agreement on December 7, 2001, Bazaar del Mundo's President, Diane Power, wrote back that the proposal is "totally unacceptable. Under no circumstances will we turn over the rights to our trade-marked names to the State unless we are fully and fairly compensated for their value," evidencing Bazaar del Mundo's understanding that it owned the marks. Power's hypothetical musings that the State might be able to own a trademark in the name of a historic site, such as the Hearst Castle, where it also operates a concession, are not relevant to the question of ownership of the marks here.

The State also makes an equitable argument based upon Bazaar del Mundo's failure to provide actual notice to the State of its registration of the marks. We fail to see how this

argument assists the State in its trademark infringement claim. Nothing in the Concession Agreement prohibits Bazaar del Mundo from registering the names of its restaurants or requires it to provide actual notice thereof to the State. Because under 15 U.S.C. § 1072 registration serves as constructive notice of the registrant's claim to ownership, the State's delay in contesting the 1985 registration of the marks may in fact estop it from bringing an infringement claim. *See Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002). Moreover, even if Bazaar del Mundo were shown to have fraudulently obtained federal registration of the marks, its common law rights in the marks would continue unabated. *See Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

**[10]** Finally, the State posits that the quality-control provisions set forth in the Concession Agreement demonstrate the existence of an implied license because well-established trademark law imposes a duty upon the licensor to retain sufficient control over the mark to prevent public deception. "The purpose of a trademark . . . is to identify a good or service to the consumer, and identity implies consistency and a correlative duty to make sure that the good or service really is of consistent quality, i.e., really is the same good or service." *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 435 (7th Cir. 1989); *see also* 2 McCarthy on Trademarks § 18:42. Without such control, "the risk that the public will be unwittingly deceived will be increased . . . . [and] the only effective way to protect the public . . . is to place on the licensor the affirmative duty of policing in a reasonable manner the activities of his licensees." *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959). Because naked and uncontrolled licensing is "inherently deceptive," *Barcamerica Int'l USA Trust v. Tyfield Imps., Inc.*, 289 F.3d 589, 598 (9th Cir. 2002), the State must have exercised a high degree of control and supervision over Bazaar del Mundo's provision of restaurant services under the marks to even assert this basis for proving an implied licensing arrangement.

**[11]** Although the State points to several measures of quality control in the Agreement to support its theory, nothing indicates that the State controlled or supervised the most critical aspects of building goodwill and value in the provision of restaurant services—the quality of the food and service. Nor do any of the provisions, which relate to such matters as signage, inspections of the premises, designated use of the premises and period dress, support a finding that the State has exercised such quality control and supervision over Bazaar del Mundo that the marks truly "reflect[ ] the goodwill and quality standards" of the State, *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 49 (9th Cir. 1971), as opposed to Bazaar del Mundo itself. The Agreement lacks any provision for routine inspections, adoption of any particular design, or even an operating manual for the conduct of the restaurants' business. Although the parties agreed that food typical of the era would be served, employees would wear Mexican dress, and the premises would be kept clean, the Agreement provided no recourse to the State if the quality of the food, dress, service, or sanitation were to deteriorate. *See Stockpot, Inc. v. Stock Pot Rest., Inc.*, 220 U.S.P.Q. 52, 58-59 (T.T.A.B. 1983) (holding that, if the validity of the license were determined solely on the basis of the lease provisions, the failure of the lease to control the quality of the food and service of the restaurant would constitute insufficient compliance with the Trademark Act).

Though we have recognized that " '[i]t is difficult, if not impossible to define in the abstract exactly how much control and inspection is needed to satisfy the requirement of quality control over trademark licensees,' " *Barcamerica Int'l*, 289 F.3d at 598 (quoting 2 McCarthy on Trademarks § 18:55 at 18-94.3), the State's evidence of control fails to approach even the level of control that we found to be insufficient in *Barcamerica*, *id.* at 596. In *Barcamerica*, 289 F.3d at 596-97, we found that random tastings by the licensor of wine sold under his trademark, where there was no evidence as to how often, or under what circumstances the licensor tasted the

wine, did not rise to the level of ongoing monitoring or quality control sufficient to defeat a naked licensing challenge. While we held in *Barcamerica* that the lack of an express contract right to inspect and supervise a licensee's operations is not conclusive evidence of lack of control, we found that there was no evidence of the licensor having a close working relationship with the licensee to render a formal agreement unnecessary. *Id.* at 597. Where "the particular circumstances of the licensing arrangement [indicate] that the public will not be deceived" because the licensor and the licensee have such a close working relationship, reliance on the measures used by the licensee may be justified, and a formal agreement providing for ongoing monitoring and inspections may not be necessary. *Id.* at 596 (internal quotation marks omitted and alteration in original); *see, e.g.*, *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1017-18 (9th Cir. 1985); *Arner v. Sharper Image Corp.*, 39 U.S.P.Q.2d 1282, 1995 WL 873730 (C.D. Cal. 1995).

Here, however, the State points to no evidence revealing any effort to monitor or sample the quality of Bazaar del Mundo's food and service. Nor is there any evidence that the State justifiably relied on Bazaar del Mundo's reputation or had established a close working relationship with it to make a formal quality-control agreement unnecessary. *Barcamerica*, 289 F.3d at 597. Any argument that Bazaar del Mundo's food and service actually was of high quality is irrelevant to our analysis, because what matters is that the State "played no meaningful role in holding" the restaurants to any "standard of quality—good, bad, or otherwise." *Id.* at 598. In addition, because "[t]he major purpose of quality control is to protect the public," exacting quality-control standards in the field of restaurant services is especially important because "a licensor's failure to exert proper quality control over a careless licensee might lead an ordinary, unsuspecting customer to make an isolated purchase of contaminated food." *Edwin K. Williams & Co., Inc. v. Edwin K. Williams & Co.-East*, 542 F.2d 1053, 1059-60 (9th Cir. 1976). As in *Barcamerica*, the

failure of the State to exercise quality control combined with the absence of a close working relationship would have misled the public into associating the marks with Bazaar del Mundo rather than the State.

The cases upon which the State relies to support its quality control theory of implied license are unavailing. The asserted cases in fact undermine the State's argument because the licensors there exercised rigorous and ongoing supervision and quality control over their licensees. In *Turner v. HMH Publishing Co.*, 380 F.2d 225, 229 (5th Cir. 1967), the licensees were required to meet standards related to "decor, design, quantity and quality of food, beverages and entertainment in the clubs"; the trademark owner produced an operating manual for its franchisees to follow; and "periodically visit[ed] the clubs and report[ed] on the maintenance of standards for food, beverages, services and decor." Similarly, the trademark owner in *Pneutek, Inc. v. Scherr*, 211 U.S.P.Q. 824, 833 (T.T.A.B. 1981), exercised adequate quality control because he personally selected advertising for the journal, employed an editorial board with veto power to peer review the papers to be published, and personally approved all promotional literature upon which the mark was displayed. Finally, the court in *Nestle Co. v. Nash-Finch Co.*, 4 U.S.P.Q.2d 1085, 1089 (T.T.A.B. 1987), found adequate control where the licensor conducted periodic inspections and provided the licensee with training programs, manuals, raw materials, suppliers, merchandising bulletins, and recipe books. When compared to the cases cited in the State's own brief, the minimal control and supervision here is an insufficient basis to support an inference of an implied licensing agreement.

[12] Finally, the State holds up California Public Resources Code § 5080.02 *et seq.*, in an effort to demonstrate a sufficient quality-control system. This effort is to no avail. Although the Code encompasses a detailed system of regulation of the bidding for and award of concession agreements, not a single

provision governs quality-control and supervision over concessionaires licensing trademarks from the State.

## C.

The State asserts that Bazaar del Mundo's intended use of the names in connection with its new restaurant locations would infringe upon its own use of the marks in Old Town and violate section 2(d) of the Lanham Act, 15 U.S.C. § 1052 because of the likelihood of confusion of the two marks. Because this argument is based on yet another convoluted reading of trademark law, the district court did not err in rejecting it.

The State reasons that it showed a "fair chance of success" on its claim to invalidate the marks because Bazaar del Mundo's use of the marks outside Old Town would deceive the public into concluding that there was some affiliation with or sponsorship by Old Town. While the State may file a petition to cancel Bazaar del Mundo's registration of the marks under 15 U.S.C. § 1064, its reliance upon 15 U.S.C. § 1052 is misplaced because that section does not create a private right of action for registering a mark giving rise to a likelihood of confusion with another mark. Rather, section 1052(d) sets forth: "No trademark . . . shall be refused registration . . . unless it . . . [c]onsists of or comprises a mark which so resembles a mark registered . . . or a mark or trade name previously used . . . as to be likely, when used on or in connection with the goods of the applicant, to cause confusion." Section 1052 simply authorizes the Director of the USPTO to reject applications for marks that have the potential to create confusion. We therefore do not reach the question of likelihood of confusion, as the State urges to do, citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). Moreover, Bazaar del Mundo's use of the mark has reached incontestable status under 15 U.S.C. § 1065. Therefore, Bazaar del Mundo is entitled to the presumption of the validity of its marks under 15 U.S.C. § 1057(b), which may allow

it to contend in the course of further proceedings that any intended use of the marks by the State in relation to restaurant services would violate its requested trademarks. *See Yellow Cab Co. of Sacramento*, 419 F.3d at 928.

## CONCLUSION

**[13]** The State has not demonstrated a likelihood of success in establishing a protectible ownership interest in the disputed trademarks and thus has not shown any basis upon which it would be entitled to injunctive relief. Therefore, the district court did not abuse its discretion in denying the State's motion for a preliminary injunction. We therefore affirm the district court's order and remand for further proceedings.

**AFFIRMED**.