THIS OPINION IS A
PRECEDENT OF THE TTAB

Hearing:                              Mailed:
October 16, 2008                      December 11, 2008

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

Ballet Tech Foundation, Inc.
v.
The Joyce Theater Foundation, Inc.
_____

Opposition No. 91180789
Cancellation No. 92042019
_____

William M. Merone of Kenyon & Kenyon LLP for Ballet Tech
Foundation, Inc.

Jordan A. LaVine of Flaster Greenberg, P.C. for The Joyce
Theater Foundation, Inc.
_____

Before Bucher, Taylor and Bergsman, Administrative Trademark
Judges.

Opinion by Bergsman, Administrative Trademark Judge:

These consolidated proceedings involve a trademark
dispute between a landlord and its tenant regarding the
ownership of the name of the Joyce Theater. Plaintiff,
Ballet Tech Foundation, Inc. (hereinafter "petitioner") is a
charitable foundation responsible for funding the Feld
Ballet Company and operating a tuition-free dance school for
public school children. It is also the owner of the
premises known as the Joyce Theater. Defendant, The Joyce
Theater Foundation, Inc. (hereinafter "respondent"), is a

charitable foundation that, among other things, manages the Joyce Theater.

Respondent has registered the following marks for "dance performance theaters and entertainment in the nature of performance arts theater productions," in Class 41:

1. JOYCE, in typed drawing form;[1]

2. JOYCE THEATER, in typed drawing form;[2]

3. JOYCE SOHO, in typed drawing form;[3] and,

4. JOYCE, shown below.[4]



Respondent has also registered the mark JOYCE THEATER FOUNDATION, in typed drawing form,[5] and has filed a use-based application for the mark JOYCE, in standard character format,[6] both for "charitable fund raising services," in

---

[1] Registration No. 2225976, issued February 23, 1999; section 8 affidavit accepted; renewed.

[2] Registration No. 2228441, issued March 2, 1999; section 8 affidavit accepted; renewed.

[3] Registration No. 2226023, issued February 23, 1999; section 8 affidavit accepted; renewed.

[4] Registration No. 2226024, issued February 23, 1999; section 8 affidavit accepted; renewed.

[5] Registration No. 2228716, issued March 2, 1999; section 8 affidavit accepted; renewed.

[6] Serial No. 77160320, filed October 16, 2007. Respondent also owned Registration No. 2317754 for the same mark and services, but it was canceled under Section 8.

Class 36.  The registrations and the application will be referred to collectively as the JOYCE marks.

Petitioner is seeking to cancel all of the JOYCE registrations and it has opposed the JOYCE application on the ground that petitioner, not respondent, is the owner of the JOYCE marks, and that respondent uses the marks pursuant to an implied license.[7]  Respondent denied the salient allegations in the petition for cancellation and the notice of opposition.

Evidentiary Issues

Petitioner has objected to the testimony of Linda Shelton, the current executive director of respondent, and of Peter Felcher, corporate counsel for both petitioner and respondent.  Essentially, petitioner argues that Ms. Shelton's testimony regarding events that took place prior to 1993, when she was first employed by respondent, constitute inadmissible hearsay or speculation because those events are outside of her personal knowledge.  With respect to Mr. Felcher's testimony, petitioner argues, in essence, that his testimony is unreliable because he has no

---

[7] The grounds set forth in the petition for cancellation include fraud, priority of use and likelihood of confusion, a false suggestion of a connection, and dilution.  The opposition also includes a claim of priority of use and likelihood of confusion. However, in their briefs, the parties identify the ownership of the JOYCE mark and whether there was an implied license as the issues.  Because the parties litigated and argued only the ownership and license issues, we deem the other grounds for cancellation and opposition to have been waived.

independent recollection of the facts and that it otherwise

includes legal conclusions. We are not inclined to strike

the testimony depositions *in toto*, nor are we inclined to

parse the depositions to separate the admissible testimony

from the inadmissible testimony. However, we are aware of

the infirmities described in petitioner's objections. To

the extent that we rely on any testimony from Ms. Shelton

and Mr. Felcher, it will be given the probative value to

which it is properly entitled pursuant to the Federal Rules

of Evidence.

## The Record

By rule, the record includes respondent's registration

and application files and the pleadings. Trademark Rule

2.122(b), 37 CFR §2.122(b). The record also includes

testimony and evidence introduced by the parties.

A. Petitioner's evidence.

Petitioner introduced the following testimony and

evidence in support of its case:

1. Two notices of reliance on documents produced by

respondent during discovery;[8]

---

[8] Although documents produced in response to document production requests cannot normally be made of record by notice of reliance (*see* Trademark Rule 2.120(j)(3)(ii), 37 CFR §2.120(j)(3)(ii)), the parties filed a stipulation that documents exchanged during discovery are authentic and may be made of record by either party. *See* TBMP §704.11 (2nd ed. rev. 2004).

2. A notice of reliance introducing photographs of the marquee of the JOYCE theater;

3. A notice of reliance on printed publications referencing the Elgin or Joyce Theaters;

4. A notice of reliance on respondent's responses to Interrogatory Nos. 3-4, 6 and 18;

5. Testimony deposition and rebuttal deposition of Eliot Feld with attached exhibits. Mr. Feld is the president of petitioner and a founding member of respondent;

6. Testimony deposition and rebuttal deposition of Cora Cahan with attached exhibits. Ms. Cahan was the former administrator, executive director and vice president of the Feld Ballet, former CEO, COO and Board member of petitioner, and former CEO and a founding member of respondent;

7. Testimony deposition of Lisa Post with attached exhibits. Ms. Post was formerly an employee of petitioner who was subsequently employed by respondent shortly after it was formed. Ms. Post served in various positions for respondent, including executive director;

8. Testimony deposition of Benjamin Schwartz, aka Roger Euster. Mr. Schwartz was the owner of the Elgin theater who sold it to petitioner; and,

9. Testimony deposition of James Russek with attached exhibits. Mr. Russek is an advertising executive who worked for petitioner and respondent. Mr. Russek was involved with

the graphic design for the renovation of the Elgin/Joyce

Theater, including the JOYCE logo on the marquee.

B.   Respondent's evidence.

1.   A notice of reliance on petitioner's responses to respondent's first set of interrogatories and first requests for admission;

2.   Testimony deposition of Linda Shelton with attached exhibits.  Ms. Shelton is the executive director of respondent; and,

3.   Testimony deposition of Peter Felcher with attached exhibits.  Mr. Felcher is a corporate attorney specializing in mergers and acquisitions.  He also practices in the entertainment field, including intellectual property.  However, Mr. Felcher is not a trademark expert.  Mr. Felcher was corporate counsel for both petitioner and respondent.  Specifically, he was the Assistant Secretary of petitioner and the Assistant Secretary and a founding member of respondent.

Facts

A.   Introduction.

Petitioner claims that it owns all rights in the JOYCE marks, and that any use of the marks by respondent has been pursuant to an implied license from petitioner.  As discussed below, petitioner is the owner of the Joyce Theater, and respondent is petitioner's tenant responsible,

under the terms of the lease, for operating a "first-class"

dance theater.

According to Professor McCarthy, the resolution of a

service mark dispute between a landlord and tenant depends

on the facts and a weighing of policies and circumstances of

each case.

> Ownership of a service mark identifying
> a business carried on at rented premises
> will depend upon weighing of the
> policies of customer perception and
> contractual provisions between the
> landlord and tenant.

McCarthy on Trademarks and Unfair Competition §16:38 (4th

ed. 2008).  In this case, where there are no express

contractual provisions between the parties regarding the

ownership and use of the JOYCE marks, we will have to

examine the dealings of the parties to determine the

ownership of the JOYCE marks and whether there was an

informal system of quality control sufficient to support an

implied license.  McCarthy on Trademarks and Unfair

Competition §18:43.50 (4th ed. 2008) ("Some courts will

imply both a trademark license and a requirement for quality

control from the dealings of the parties").  *See also*

*Woodstock's Enterprises Inc. (California) v. Woodstock's*

*Enterprises Inc. (Oregon),* 43 USPQ2d 1440, 1446 (TTAB 1997)

("Sufficient control by a licensor may exist despite the

absence of any formal arrangements for policing the quality

of the goods sold or services rendered under the mark by its

licensee(s)"); *University Book Store v. University of Wisconsin Board of Regents,* 33 USPQ2d 1385, 1396 (TTAB 1994) ("the reality of the situation which existed for many years may best be characterized as that of a royalty-free, nonexclusive, implied license to use the marks"); *Winnebago Industries, Inc. v. Oliver & Winston, Inc.,* 207 USPQ 335, 341 (TTAB 1980) (the record established that opposer employed an informal, rather than formal, system of quality control); *Ideal Toy Corporation v. Cameo Exclusive Products Inc.,* 170 USPQ 596, 598 (TTAB 1971) (although the agreement between the parties did not address defendant's right to control the nature and quality of the goods sold under the mark at issue, defendant's CEO could, in fact, control the nature and quality of the goods).  Within this framework, we discuss the facts.[9]

B.    The Purchase of the Elgin Theater.

During the 1970's, small and mid-size dance companies had very few economically viable venues.  The Feld Ballet

---

[9] There is no real dispute about the operative facts; rather, the parties disagree about what the facts mean.  Under these circumstances, this case would have been a good candidate for the Board's accelerated case resolution procedure ("ACR").  ACR is a procedure akin to summary judgment in which parties can receive a determination of the claims and defenses in their case promptly, but without the uncertainty and delay typically presented by standard summary judgment practice.  In order to take advantage of ACR, the parties must stipulate that, in lieu of trial, the Board can resolve any material issues of fact (*e.g.,* whether the parties in this case intended for petitioner to own the JOYCE mark and license it to respondent).  After the briefs are filed, the Board will issue a decision within fifty days, which will be judicially reviewable as set out in 37 CFR §2.145.

Company, and other mid-size dance companies, did not have ready access to any of the existing theaters in downtown New York City or Off-Broadway which suited their purposes. Moreover, the larger Broadway theaters were not economically feasible because of the production costs. Based on their experience, Eliot Feld and Cora Cahan concluded that small to mid-size dance companies needed a 500-seat theater.[10]

In November 1978, Ms. Cahan and Mr. Feld learned the Elgin Theater was for sale.[11] The Elgin Theater was an empty motion picture theater. It had the potential to meet the needs of small and mid-size dance companies. In December 1978, Eliot Feld approached petitioner's board of trustees regarding the purchase of the Elgin Theater for use by its dance company.[12]

Petitioner negotiated a purchase price of $225,000 for the theater. The cost of renovations was estimated at approximately $990,000 to $1,200,000. Mr. Feld and Ms. Cahan discussed the purchase of the Elgin Theater with LuEsther Mertz, a patron of the arts who had made her fortune as the owner of Publishers Clearinghouse. Ms. Mertz was a fan and long-time supporter of Mr. Feld's choreography, and she became a close friend of Mr. Feld and

---

[10] Cahan Dep., pp. 21-24 and Exhibit 6 (the December 13, 1997 minutes of petitioner's board of trustees meeting); Feld Dep., pp. 15-17.
[11] Cahan Dep., pp. 24-27; Feld Dep. pp. 17-18.
[12] Cahan Dep., Exhibit 6

9

Ms. Cahan. Accordingly, she was amenable to funding the acquisition of the theater.[13]

Petitioner's board also discussed how to pay for the renovations. "Mr. Gersten [Ms. Cahan's husband] indicated that one possibility would be to seek a single major contributor who would provide most of the renovation costs, in which case, as a tribute to this generosity, the theater could bear the name of such contributor."[14] Otherwise, it was petitioner's intention to keep the "Elgin" name and operate it as the Elgin Theater.[15]

The Elgin Theater was built in the early 1930's, and it had always been known as the Elgin Theater.[16] Petitioner bought the Elgin Theater, its name and whatever goodwill existed.[17] However, it was understood that the name of the

---

[13] Cahan Dep., pp. 34-37, 165, 167 and Exhibit 6. The price was originally $210,000, but it increased to $225,000 because petitioner had to buy out an existing lease in the building. (Cahan Dep., Exhibit 5, the January 9, 1979 minutes of petitioner's board of trustees meeting). The renovations ultimately cost $4 million. (Cahan Dep., p. 33). *See also* Feld Dep., pp. 9-10, 19, 25-26; Felcher Dep., p. 29.

[14] Cahan Dep., pp. 38-39 and 49 and Exhibit 6. The "tribute" comment was also published in an article in the January 18, 1979 issue of the *Chelsea Clinton News* announcing petitioner's purchase of the Elgin Theater (Cahan Dep., Exhibit 4); *See also* Feld Dep., Exhibit 1 (the January 29, 1979 issue of the *New York Times*).

[15] Cahan Dep., p. 38.

[16] Schwartz Dep., p. 5.

[17] Cahan Dep., pp. 38, 151-153; Feld Dep., p. 21. Schwartz Dep. p. 10-11 (Schwartz sold the theater "lock, stock and barrel," including the name of the theater).

theater might be changed to honor a major donor.[18]

C.    The Creation of Respondent.

Eliot Feld and Cora Cahan knew that the purchase of the Elgin Theater was just the beginning.  It would take a large, long-term fund-raising effort to pay for the renovations and the continued operations of the theater.[19] Exploratory meetings with potential donors confirmed that there was great interest in a theater dedicated to dance, "provided that it was clearly understood that the theater would be operated for the benefit of dance companies in general, and that the Board of the entity operating the theatre (sic) would be made up of a representative cross section of individuals from the dance community at large."[20] In addition, Mr. Feld and Ms. Cahan concluded that it would be easier to raise funds through a separate entity because many of the potential donors would be hesitant to donate to petitioner twice:  once to support the dance company and once to support the theater.[21]

In consultation with petitioner's attorneys and accountants, Eliot Feld, Cora Cahan and petitioner's other

---

[18] Cahan Dep., pp. 76-77; Feld Dep. p. 43.
[19] Cahan Dep., pp. 30 and Exhibit 6 ("Ms. Schwartz [a director] stated that the Foundation should recognize that the raising of the funds for the purpose of renovation would be a major undertaking and that it was important to plan this activity carefully"); Feld Dep. pp. 72-73.
[20] Cahan Dep., pp. 56-57 and Exhibit 11 (the April 30, 1979 minutes of petitioner's board of trustees); Feld Dep., pp. 41-43.
[21] Cahan Dep., pp. 56-57 and Exhibit 11.  *See also* Felcher Dep., pp. 17-19.

trustees decided that petitioner should form a separate, tax-exempt entity to raise funds for the renovation and operation of the Elgin Theater.[22]

Petitioner's trustees studied the roll of the new entity and how to maintain control over it. They considered transferring ownership of the theater, as well as leasing it to the new entity for a nominal fee. Petitioner selected the lease option because it would ensure that the theater was operated in accordance with petitioner's intentions.[23]

> It was also indicated that the corporate
> structure of [respondent] would be
> designed so that [petitioner] would
> maintain effective control to insure
> that the intended purposes of the
> project would be carried out.[24]

In addition, petitioner selected the lease option because petitioner's employees were doing all the work raising the funds and planning and supervising the renovation and petitioner was taking all the risk in acquiring and developing the property.[25]

Having selected the lease option, petitioner, in consultation with its legal counsel, "concluded that the requisite control [over the new entity] could be achieved if certain members [of the Board of Trustees] of the

---

[22] Cahan Dep., Exhibit 11.
[23] Cahan Dep., p. 64 and Exhibit 11. *See also* Felcher Dep., pp. 74-77 and Exhibit 8.
[24] Cahan Dep., Exhibit 11.
[25] Cahan Dep., pp. 16-19, 63.

[petitioner] also were members [of the Board of Trustees] of the new entity, and in addition, if certain officers of the [petitioner] and the new entity were the same individuals. The structure contemplated was to have respondent governed by a board of trustees that managed its affairs, with Mr. Feld, Ms. Cahan and Mr. Gersten constituting a body of members that elected the board of trustees and having the sole power to elect and remove directors and officers and also be officers of the new entity."[26]  In other words, if member's of respondent's board voted in a manner contrary to the wishes of Mr. Feld and Ms. Cahan, they could remove them.[27]

Ultimately, petitioner founded respondent with the structure described above,[28] and respondent was called the

---

[26] Cahan Dep., Exhibit 11.  Mr. Felcher ultimately took Mr. Gersten's spot in the new entity.  *See also* Cahan Dep., p. 140 ("The establishment of the three-permanent-member aspect of the trustees was clearly meant to protect the interests of the [petitioner] in terms of the way the [respondent] operated the Elgin Theater") and 262; Feld Dep. pp. 46-49; Felcher Dep., p. 24; Shelton Dep., p. 22.

[27] Feld Dep., p. 167-168.  *See also* Felcher Dep., p. 24 (respondent was governed by a board of trustees that managed its affairs and there was a body of members [Mr. Feld, Ms. Cahan and Mr. Felcher] that elected the board of trustees).  Mr. Felcher was not involved in the operation of or policy-making for the theater.  His role was limited to legal matters and taking notes at the board meetings.  (Felcher Dep., p. 25).  He served as the tie-breaking vote between "the very strong vested interest of Mr. Feld and Ms. Cahan."  (Felcher Dep., p. 85).

[28] Cahan Dep., p. 167.  These events contradict Mr. Felcher's testimony that respondent "should not be closely associated with" petitioner.  (Felcher Dep., p. 17).  However, Mr. Felcher later testified that respondent was initially designed so that it was controlled by petitioner.  (Felcher Dep., pp. 70-71).

13

Elgin Theater Foundation so that it would be associated with the name of the theater.[29] According to Ms. Cahan, petitioner owned the Elgin Theater building and the Elgin Theater name, and it gave respondent permission to use the name the Elgin Theater Foundation.[30] Moreover, if the name of the theater was changed to honor a donor, then it was understood that the defendant would change its name to match the theater name and to maintain the association between the defendant and theater.[31]

D. The Name Change to the Joyce Theater.

LuEsther Mertz proved to be a major benefactor for petitioner and respondent. Accordingly, Eliot Feld and Cora Cahan wanted to honor Ms. Mertz by naming the theater after her. After some prodding, Ms. Mertz agreed that the theater could be called the Joyce in honor of her deceased daughter.[32] Once Ms. Mertz agreed that the theater could be called the Joyce, Elliot Feld and Cora Cahan promised that "it would be known forevermore as the Joyce."[33] Eliot Feld and Cora Cahan reported this decision to respondent's board and then to petitioner's board. The respective boards of

---

[29] Cahan Dep., p. 59; Feld Dep., pp. 43, 56.
[30] Cahan Dep., pp. 60-61. *See also* Feld Dep. p. 54 (it was Mr. Feld's expectation that respondent was going to operate the theater as the Elgin).
[31] Cahan Dep., 76-78; Feld Dep. pp. 45-46, 58, 112-113, 130.
[32] Cahan Dep., pp. 89-96; Feld Dep., pp. 35-38.
[33] Cahan Dep., pp. 96, 107-108.

directors passed resolutions approving the name change,[34]

including a second resolution by each board affirming that

"the name Joyce Theater shall be permanently used as the

name of the theater."[35]

E.   Monitoring the Renovation of the Theater and the
     Initial Operation of Respondent.

Initially, the staffs of the petitioner and respondent

were the same.[36]

> Well in the initial years when we were
> renovating the theater, all of my staff
> was [petitioner's] staff, so we just
> worked out of the [petitioner's] offices
> and we were doing both jobs
> simultaneously.  I mean, we were just
> running the company and raising money
> for the theater and meeting with the
> architects and talking with the
> contractor and raising the money and
> writing the grant applications and
> dealing with the MCDC and Department of
> Commerce and UDAG grant and the City of
> New York.
>
> It was simple.  There were very few of
> us and we just worked all the time, and
> we saw the Elgin Theater, which became
> the Joyce Theater, was of prime
> importance to the company, so we didn't
> separate, really, our roles.  We were
> running the company, but we were also
> building a theater, and the fate, the
> destiny of the theater was tied to that
> - - of the company was tied to the
> theater being built, the theater being
> built well and that theater succeeding
> over the long haul.
>
> So we didn't separate the making-the-
> theater-happen activities from the

---

[34] Cahan Dep., pp. 99-106, 171-187 and Exhibits 16 and 20.
[35] Cahan Dep., Exhibits 21 and 22.
[36] Cahan Dep., pp. 75-76, and 78; Feld Dep. pp. 73-75.

keeping-the-company-running activities because the company and the theater were - - the fate of the company was bound up in the ultimate successful establishment of the Joyce Theater.[37]

In other words, respondent was an extension of petitioner.[38]

The [respondent] was created by, set up by and defined by [petitioner], so it wasn't the way you put it, as two separate entities.  It really was set up so that we could have a vehicle to both raise money and spend money on behalf of the Joyce Theater or the Elgin Theater, whatever it was being called at any particular moment."[39]

In fact, Ms. Cahan was responsible for planning the renovation of the theater, including fundraising and acting as respondent's first CEO and Vice President of its board of directors.[40]

Finally, petitioner controlled the respondent by virtue of the fact that Eliot Feld, Cora Cahan, and Peter Felcher were the three permanent members of respondent's board of trustees.[41]

F.    The Lease.

---

[37] Cahan Dep., pp. 109-110.  *See also* Cahan Exhibit 17 (Ms. Cahan's November 15, 1982 correspondence declining to accept compensation for her activities at respondent because "undertaking the responsibilities at the Joyce and spending whatever time is required by the Joyce during this period is by definition an extension of my function at the Feld Ballet").

[38] Cahan Dep., pp. 137 – 139; Feld Dep. pp. 106-107 (respondent is a "surrogate to implement the ideas, the wishes" of petitioner).

[39] Cahan Dep., p. 139.

[40] Cahan Dep., pp. 12 and 164.

[41] Cahan Dep., p. 76.

On March 6, 1981, petitioner and respondent signed the lease for the Elgin Theater, now called the Joyce Theater. Eliot Feld signed the lease on behalf of petitioner, Cora Cahan signed the lease on behalf of respondent, and Peter Felcher witnessed the signatures.[42]

Petitioner asks us to view the lease as including an implied trademark license covering the name of the theater whether, it is called the Elgin Theater or the Joyce Theater. "Although the lease does not expressly mention the parties' trademark relationship . . . it nonetheless still includes the basic structure of a trademark license."[43] However, in our opinion, the lease is nothing more than a lease for real property. First, the lease does not reference the name of the theater. Second, the lease neither expressly nor impliedly licenses any trademark rights. Nevertheless, the lease is relevant because it helps to illuminate the dealings of the parties for determining whether there was an informal system of quality control sufficient to support an implied trademark license.

The lease provides that the property will be used as a dance theater.

---

[42] Cahan Dep., Exhibit 14 (the lease). Although Cora Cahan signed the lease on behalf of The Elgin Theater Foundation, Inc., the lease was signed after the name of the theater was changed to the Joyce Theater and after the respondent changed its name to The Joyce Theater Foundation, Inc. (Felcher Dep., pp. 27-28). This out-of-order chronology has no effect on our findings other than

> [T]he Demised Premises will at all times
> be operated and maintained by Tenant as
> a not-for-profit theatre, primarily for
> dance, and that Tenant will use all
> reasonable efforts and will diligently
> endeavor to raise funds and
> contributions from public and private
> sources in an attempt to minimize the
> charges which must be imposed on dance
> companies using the Demised Premises.[44]

In this regard, respondent agrees to maintain the premises

consistent with "'first class' buildings of similar

construction which contain similar facilities," pursuant to

petitioner's "reasonable judgment."[45]

Petitioner has the right to enter the theater and

inspect the premises.[46]

Respondent may not change or alter the premises without

petitioner's consent if the proposed change or alteration

would change the type or character of the "Improvement,"

reduce the size or value of the "Improvement," or cost more

than $10,000.[47]  Any change or alteration costing more than

$10,000 shall be made under the supervision of an architect

or engineer selected by respondent and approved by

petitioner.[48]  Respondent must give petitioner advance

---

to add to the confusion regarding the parties' relationship and
ownership of the JOYCE marks.
[43] Petitioner's Brief, p. 37.
[44] Lease, ¶15.2.
[45] Lease, ¶8.2
[46] Lease, ¶17.1.
[47] Lease, ¶12.2.  "Improvements" mean the building, including the
appurtenances and fixtures.  (Lease, ¶1.4).
[48] Lease, ¶12.6.

notice of any change or alteration exceeding $5,000.[49]  With respect to changes or alterations to the theater, the "Joyce" name on the marquee appears to be a fixture because it is built into the marquee,[50] and it was designed to be the permanent name of the building.[51]

If respondent fails to perform or comply with any provisions in the lease, petitioner may terminate the lease.[52]

Upon the termination of the lease, for any reason, the respondent will surrender possession of the premises, including "Tenant's Alterations," to petitioner.[53]

Petitioner has the right of first refusal to use the theater for up to 90 days per year, and agrees that it will pay respondent the same rent and perform under the same terms and conditions as other dance companies.[54]  Petitioner agreed to rent and perform under the same terms and conditions as other dance companies to show that the only benefit it was receiving from owning the theater was the right of first refusal for performance dates.[55]

G.   The Joyce Theater Performance Rental Agreement.

---

[49] Lease, ¶12.5
[50] Russek Dep., p. 22-23 ("I mean again those letters are fashioned out of stainless steel.  They're part of the structure because they have been wired into it.  I mean all that neon that runs through that is wired into those letters.  I have to believe that you can't just take a letter off").
[51] Russek Dep., p. 24.
[52] Lease, ¶24.
[53] Lease, ¶7.1.
[54] Lease, ¶25.

The Joyce Theater rental agreement provides that respondent has the right to review and approve advertising to make sure that the JOYCE marks are used properly.[56]  In fact, respondent has had to reprimand petitioner for failing to properly use the JOYCE marks.[57]

H.    Monitoring the Quality of Respondent's Performance.

In addition to the lease between the parties, petitioner has monitored the quality of services rendered under the JOYCE marks in the following manner:

1.    Petitioner's staff acted on behalf of respondent;

2.    Cora Cahan reported the status of the renovations to petitioner's board of directors; and,

3.    The Feld Ballet Company performs at the theater.[58]

The Feld Ballet Company performed at the Joyce Theater every season since 1982 except for the 2003-2004 and the 1997-1998 seasons.[59]  Over the twenty-five year history of the Joyce Theater, the Feld Ballet Company performed at the theater more than any other dance company.[60]  Mr. Feld estimated that the Feld Ballet Company performed at the

---

[55] Cahan Dep., pp. 116-118, 197.
[56] Cahan Dep., Exhibit 18 (the theater rental agreement), ¶10.
[57] Shelton Dep., pp. 90-92 and Exhibit 9.  Petitioner corrected its misuse of the JOYCE marks, and never complained that petitioner, not respondent, was the owner of the JOYCE marks. (Shelton Dep., pp. 91-92).
[58] Cahan Dep., p. 122; Feld Dep., pp. 76-79, 89-90 (the Feld Ballet continues to perform at the Joyce Theater), 92, 116 (in 2006, Mr. Feld visited the theater 3 or 4 times and his company also performed at the theater for 2 weeks during which he was at the theater 14 hours a day, every day).
[59] Feld Rebuttal Dep., pp. 5-8.
[60] Feld Rebuttal Dep., p. 9.

Joyce Theater just under 20% of the available time through the 2002-2003 season.[61]

When respondent hired its first executive director, that person reported to Ms. Cahan.[62]  In addition, Ms. Cahan was involved in the decision to hire Linda Shelton, respondent's current executive director.[63]

Respondent has maintained the quality of the Joyce Theater as a "first-class" dance theater.[64]

I.    Dissolution of Interlocking Permanent Trustees.

The system of interlocking directorships terminated in 1993 when Eliot Feld resigned from respondent's board.[65] Mr. Feld resigned from respondent's board because the LuEsther T. Mertz Charitable Trust wanted ownership of the theater to be transferred to respondent.  Mr. Feld believed it would be a conflict of interest to negotiate the transfer of ownership as a member of both boards.[66]

---

[61] Feld Rebuttal Dep., p. 10.  However, Mr. Feld acknowledged that over the last four years his company has had fewer performances at the Joyce Theater.  (Feld Rebuttal Dep., p. 20).  Ms. Shelton testified that she is not aware that petitioner's representatives visit the Joyce Theater on a regular basis.  (Shelton Dep., p. 83).

[62] Cahan Dep., p. 111.

[63] Cahan Dep., pp. 122-123.

[64] Cahan Dep., p. 119; Feld Dep. pp. 88-89.  *See also* Post Dep., p. 44-45 (during the time Ms. Post worked for respondent, 1982 - 1991, the reputation of the Joyce Theater did not change).

[65] Cahan Dep., pp. 124-127; Feld Dep., p. 86.

[66] Feld Dep., p. 87.  *See also* Shelton Dep., pp. 60-61.

Discussion

A.   Ownership of the JOYCE Marks

Based on the facts and circumstances forming the relationship of the parties, we find that petitioner is the owner of the JOYCE marks and that respondent is using the JOYCE marks pursuant to an implied license.  In reaching this conclusion, we start with the premise that ownership of a service mark may be acquired through controlled use by one's related companies (or licensees) even in the absence of any use by the purported trademark owner.  Section 5 of the Trademark Act of 1946, 15 U.S.C. §1055, provides that "[w]here a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and shall not affect the validity of such mark or of its registration."[67] Accordingly, ownership of a mark may be acquired through its use by a controlled licensee, even though the trademark owner itself does not use the mark.  *Central Fidelity Banks, Inc. v. First Bankers Corporation of Florida*, 225 USPQ 438, 439-440 (TTAB 1984); *In re Raven Marine, Inc.*, 217 USPQ 68, 69 (TTAB 1983); *Warner Bros. Inc. v. Road Runner Car Wash*,

---

[67] The term "related company" is defined as "any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used."  Section 45 of the Trademark Act of 1946, 15 U.S.C. §1127.

22

*Inc.,* 189 USPQ 430, 431 (TTAB 1976); *Basic Incorporated v.*

*Rex,* 167 USPQ 696, 697 (TTAB 1970). On the basis of the

record, we are persuaded that petitioner is the owner of the

JOYCE marks even though respondent has been the only user

because there is an implied license between the parties.[68]

Our analysis shows that petitioner ultimately controls the

nature and quality of the services rendered in connection

with the mark.

Petitioner bought the Elgin Theater and intended to

operate it as the Elgin Theater unless a donor agreed to

contribute a significant sum to finance the renovation of

the theater. After LuEsther Mertz made substantial

contributions for acquisition and renovation of the Elgin

Theater, she agreed that the theater could be renamed the

"Joyce Theater" in honor of her late daughter.

After petitioner purchased the Elgin Theater, it

established respondent to operate the theater. Petitioner

controlled respondent from respondent's creation until 1993

by virtue of the interlocking directors comprising Eliot

Feld, Cora Cahan and Peter Felcher. In fact, respondent was

designed so that petitioner would maintain effective control

---

[68] Contrary to respondent's argument, the fact that respondent was
the first entity to use the JOYCE marks does not make it the
owner of the marks because of our finding that respondent used
the marks pursuant to the license with petitioner. *See*
Respondent's Brief, p. 23.

23

over it.[69]  Under these circumstances, we find that

petitioner selected the JOYCE name and intended to control

its use through an authorized licensee.  We agree with Eliot

Feld that it would be "ludicrous" to contend that petitioner

did not own the JOYCE marks after petitioner purchased the

Elgin Theater, did all the work raising the funds and

renovating the theater, and took all of the risk involved in

the undertaking.[70]  Moreover, petitioner's claim of

ownership is further supported by the decision that the

theater would be called the Joyce Theater forever because no

matter who managed the theater for petitioner, the theater

would always be called the Joyce Theater.

---

[69] Respondent contends that petitioner "recognized that the only
way to raise the required funds for the *Elgin Theater* renovations
would be to create a separate and autonomous not-for-profit
entity that could raise the required money for the theater
renovations and then operate and manage the theater into the
future."  (Respondent's Brief, p. 6).  However, at least until
1993, when Eliot Feld resigned from respondent's board,
respondent was not autonomous.  It was controlled by Eliot Feld,
Cora Cahan and Peter Felcher in their roles as the interlocking
directors of petitioner and respondent.  Respondent's argument
that the interlocking directors had the sole power of electing
and removing trustees and officers of respondent, but that they
did not have the authority to control how the other trustees
voted, exalts form over substance.  (Respondent's Brief, p. 7).
If the trustees did not vote as directed, they could be removed
by Eliot Feld, Cora Cahan, and Peter Felcher.
[70] Feld Dep., p. 166.

B.   Petitioner Controls the Nature and Quality of the
     Services Rendered Under the JOYCE Marks.

Based on the evidence of record, we find that
petitioner informally, rather than formally, monitored the
quality of the services rendered by respondent under the
JOYCE marks.  While there was no specific program or
particular procedures for inspecting the services,
nevertheless, petitioner's efforts to control the nature and
quality of the services rendered under the JOYCE marks are
sufficient to support the licensing relationship.  *Stock
Pots Restaurant, Inc. v. Stockpot, Inc.,* 737 F.2d 1576, 222
USPQ 665, 667-668 (Fed. Cir. 1984) (defendant exercised
sufficient control over the use of its mark through the
provisions of a lease); *Woodstock's Enterprises Inc.
(California) v. Woodstock's Enterprises Inc. (Oregon),* 43
USPQ2d at 1446 ("Sufficient control by a licensor may exist
despite the absence of any formal arrangements for policing
the quality of the goods sold or services rendered under the
mark by its licensee(s)").

First, as described above, from its creation until
1993, petitioner controlled respondent by virtue of the
interlocking directors.  Cora Cahan, Peter Feld, and Peter
Felcher had the authority to remove any of respondent's
directors who disagreed with them.  Moreover, immediately
after the creation of respondent and through the opening of

25

the JOYCE theater, petitioner and respondent were effectively one-and-the-same.

Second, the lease between petitioner and respondent for the theater is a part of the process by which petitioner exercises control over the nature and quality of the services rendered under the JOYCE marks. The lease contains the following provisions illustrating petitioner's control over the services rendered in the theater:

1. Respondent must maintain the premises as a not-for-profit, "first-class" dance theater. The determination of whether the Joyce Theater is "first-class" is within petitioner's reasonable judgment.

2. Petitioner has the right to enter the theater and inspect the premises.

3. Respondent may not change or alter the premises without petitioner's consent. As discussed above, we have found that the name of theater on the marquee is a fixture that may not be changed without petitioner's consent.

4. If respondent fails to perform or comply with any provisions in the lease, petitioner may terminate the lease.

5. Upon the termination of the lease, for any reason, the respondent will surrender possession of the premises, including any changes that respondent makes to the premises.[71]

Finally, petitioner, through the Feld Ballet Company, utilizes the theater services provided by respondent. Thus, petitioner has had ample opportunity to inspect the nature

---

[71] If the name of the theater is a fixture and the fixture transfers to petitioner, then the name would remain with petitioner.

26

and quality of the theater services rendered under the JOYCE marks.

Under these circumstances, we find that petitioner has exercised sufficient control over the nature and quality of the services rendered under the JOYCE marks. *Cf Taco Cabana International, Inc. v. Two Pesos Inc.,* 952 F.2d 1113, 19 USPQ2d 1253, 1259 (5th Cir. 1991), *aff'd* 505 U.S. 763 (1993) ("Where the license parties have engaged in a close working relationship, and may justifiably rely on each parties' intimacy with standards and procedures to ensure consistent quality, and no actual decline in quality standards is demonstrated,[72] we would depart from the purposes of the law to find an abandonment simply for want of all the inspection and control formalities").

C.   *Department of Parks and Recreation for the State of California v. Bazaar Del Mundo Inc.*

Respondent argues that these proceedings are "extraordinarily similar to the dispute between the parties in *California Departments of Parks and Recreation.*"[73]   The critical issue in *Department of Parks and Recreation for the State of California v. Bazaar Del Mundo Inc.,* 448 F.3d 1118, 78 USPQ2d 1887 (9th Cir. 2006) was whether the State of California owned the trademarks CASA DE BANDINI and CASA DE

---

[72] Respondent's performance operating the Joyce Theater has been exemplary.   (Cahan Dep., p. 119).
[73] Respondent's Brief, pp. 28-29.

PICO for restaurant services.  The operative facts are set

forth below:

1.    In 1968, the State acquired land encompassing the Casa de Pico and Casa de Bandini properties in Old Town San Diego.

2.    In 1971, the State and Bazaar Del Mundo executed a contract providing that Bazaar Del Mundo could operate a Mexican-style shopping arcade on the properties in exchange for rent and a percentage of the receipts.

3.    In 1985, Bazaar Del Mundo federally-registered the marks CASA DE BANDINI and CASA DE PICO for restaurant services.

4.    In March 2005, after a bitter administrative proceeding, the State terminated the contract with Bazaar Del Mundo, and a new concessionaire took over.

5.    In May, 2005, Bazaar Del Mundo announced that it was opening new CASA DE BANDINI and CASA DE PICO restaurants on the water-front in downtown San Diego.

6.    The State filed a declaratory judgment action for trademark infringement.  The district court found that the State failed to demonstrate that it owned the trademarks, and the State appealed.

On appeal, the State argued that the Concession

Agreement with Bazaar Del Mundo operated as trademark

license.  However, the State was unable to prove that there

was an implied license "because it failed to introduce any

evidence of an agreement or course of conduct by the parties

to contract for a trademark license.  The clear intent of

the parties as evidenced by the Concession Agreement itself

was solely to lease premises – not to license trademarks."

*Department of Parks and Recreation for the State of*

*California v. Bazaar Del Mundo Inc.,* 78 USPQ2d at 1896.
There was no course of dealing between the parties to create
an implied license and nothing to show that the State
controlled or supervised the nature and quality of the
restaurant services rendered under the marks.  The court of
appeals noted that there was no recourse to the State if the
quality of the food, service, or sanitation deteriorated and
that the State "'played no meaningful role in holding' the
restaurants to any 'standard of quality – good, bad, or
otherwise.'" *Department of Parks and Recreation for the
State of California v. Bazaar Del Mundo Inc.,* 78 USPQ2d at
1897-1898.

Contrary to the facts in *Bazaar Del Mundo,* in these
proceedings we find that the course of conduct between the
parties created an implied license.  First, when petitioner
purchased the Elgin Theater and then formed respondent,
petitioner intended to own the name of the theater and
license it to respondent.  Second, petitioner designed
respondent so that petitioner could maintain control over it
and, thus, maintain control over the name of the theater.
Third, the lease, as evidence of the dealings between the
parties, provides that respondent must render "first class"
dance theater services, cannot make alterations or changes
to the theater without petitioner's consent, and upon
termination of the lease for any reason, including a default

29

or breach by respondent, respondent must surrender the premises, including any alterations, to petitioner. In addition, the lease provides petitioner with a right to enter and inspect the premises. Finally, by virtue of petitioner's use of the theater, petitioner has monitored the nature and quality of the services rendered under the JOYCE marks.

D.    The JOYCE SOHO Expansion.

Respondent argues that petitioner's failure to object to the JOYCE SOHO theater, a second location acquired and operated by respondent for the past 12 years without permission or any input from petitioner, demonstrates that petitioner has not exercised any control over the services rendered by respondent, and therefore an implied license does not exist.[74] As indicated above, we have determined that petitioner is the owner of the JOYCE marks and that respondent is using the marks by virtue of an implied license. Petitioner's failure to object to respondent's use of the JOYCE SOHO mark does not prove that petitioner has not exercised quality control over the services rendered under the marks. In other words, petitioner's failure to object to the JOYCE SOHO mark does not amount to an abandonment of petitioner's trademark rights in the JOYCE marks. We find that petitioner is exercising sufficient

---

[74] Respondent's Brief, pp. 17, 43-44.

control over the JOYCE marks by virtue of the lease between the parties and through its performances at the theater. *See Woodstock's Enterprises Inc. (California) v. Woodstock's Enterprises Inc. (Oregon),* 43 USPQ2d at 1447 (no uncontrolled use resulting in the mark losing all of its source significance); *University Book Store v. University of Wisconsin Board of Regents,* 33 USPQ2d at 1396 (third-party use of college mascot was not uncontrolled use resulting in abandonment; rather it was a royalty-free, implied license). Moreover, petitioner believed that respondent's expansion to the JOYCE SOHO Theater was consistent with the mission and goals of the original Joyce Theater, and that it was an acceptable use of the Joyce name at that theater.[75] Therefore, petitioner saw no reason to object to respondent's use of the JOYCE SOHO service mark.

E.     Respondent's Control Over the Use of the JOYCE marks.

Relying on the Joyce Theater performance rental agreement, respondent argues that it, not petitioner, has been the exclusive user of the JOYCE marks and that it, not petitioner, has always controlled the nature and quality of the services rendered under the JOYCE marks.  That document

---

[75] Feld Dep., pp. 117-119, 160-164 ("So it was a pleasing amplification of what we had established at the Joyce Theater"); Cahan Dep., pp. 242, 244. *See also* Shelton Dep., p. 67 ("Oh, [Cora Cahan] was very supportive of [the Joyce Soho].  She thought purchasing the building was well within the Joyce's mission and that this would be a wonderful addition to the dance field and that it would something that we should do").

sets forth "the terms under which the performers may use the JOYCE trademarks" and "require(s) that the licensees obtain approval from [respondent] before using the JOYCE marks."[76] Respondent reasons that petitioner never believed that it owned the JOYCE marks because it signed the Joyce Theater performance rental agreement numerous times and never once claimed that it, not respondent, was the owner of the JOYCE marks.[77]

We do not interpret petitioner's compliance with the terms under which performers may use the JOYCE marks in the Joyce Theater performance rental agreement as a declaration or concession that respondent is the owner of the JOYCE marks. It is simply an expression that petitioner agreed to perform under the same terms and conditions as other dance companies.

Moreover, we construe petitioner's compliance with the terms of the Joyce Theater performance rental agreement as petitioner's delegation to respondent to police the use of the JOYCE marks. *Woodstock's Enterprises Inc. (California) v. Woodstock's Enterprises Inc. (Oregon),* 43 USPQ2d at 1446 ("Control may also be adequate where the licensor justifiably relies on the integrity of the licensee to ensure the consistent quality of the services performed

---

[76] Respondent's Brief, p. 13.
[77] Respondent's Brief, p. 14.

under the mark"); *Winnebago Industries, Inc. v. Oliver &*

*Winston, Inc.,* 207 USPQ 335, 341 (TTAB 1980) (the informal

nature of opposer's quality control included the general

reputation of the manufacturer).  *See also* <u>Restatement</u>

<u>(Third) of Unfair Competition</u> §33, comment c (1995)

(trademark owner may rely on the reputation and expertise of

the licensee so long as there is no evidence indicating

deviations from the agreed standards or procedures).

F.    <u>Ms. Cahan Suggested that Respondent Register the JOYCE</u>
      <u>marks</u>.

To further support its position that it is the rightful

owner of the JOYCE marks, respondent asserts that it "filed

its trademark applications for the JOYCE marks only after

Ms. Cahan herself, who at that time was still a member of

[respondent's] Board of Trustees, recommended in her

fiduciary capacity to [respondent's] Board of Trustees that

steps be taken to register the JOYCE marks with the U.S.

Patent and Trademark Office."[78]  In fact, respondent argues

that Ms. Cahan "believed [respondent] was the appropriate

entity to seek and finance registration of the marks in the

U.S. Patent and Trademark Office because it was the sole

entity responsible for operating and managing the *Joyce*

*Theater.*"[79]

---

[78] Respondent's Brief, p. 14.
[79] Respondent's Brief, p. 15.  Respondent contends that Ms.
Cahan's current position that petitioner is the rightful owner of
the JOYCE marks is "fueled by personal considerations," namely

33

We believe that respondent has overstated the importance and meaning of Ms. Cahan's suggestion to Ms. Shelton that respondent protect the JOYCE marks. In 1997, Ms. Cahan, in her capacity as President of The 42nd Street Entertainment Corporation, learned, for the first time, that a non-profit corporation could protect its name.

> They [counsel] said well, you can trademark your name and you can protect the name. You can protect the name so that others can't use it, and that was something that had never occurred to me and I was unfamiliar with any non-profit ever going through any kind of registration of the name of the organization or the name of their place in order to protect it.[80]

Prior to this event, Ms. Cahan had no knowledge about trademark law in general, or trademark ownership issues in particular.[81] Ms. Cahan became energized by this information and shared it with everyone she could.

> I then began to proselytize wherever I went and speak to everybody about the fact that you could protect the name of a non-profit by registering it with the trademark entities, whatever they're called.[82]

---

the shock and hurt caused by respondent's decision not to re-elect her to the Board. (Respondent's Brief, p. 15). Ms. Cahan admits that she was hurt when she was not re-elected to the Board, we find her testimony to be credible and not based on a desire for retaliation.

[80] Cahan Dep., p. 235.

[81] Cahan Dep., pp. 271-273

[82] Cahan Dep., pp. 235-236. *See also* Post Dep., pp. 8 ("So [Cahan] was telling everybody that we met with about, that they should trademark their name. It became her, you know, song at the time"), 31-32, 34 ("Cora was telling everybody she came into a room with that this is what they should do. This, the conversation that she had with, at the Joyce board meeting was

Ms. Cahan shared her trademark epiphany with respondent's executive director, Linda Shelton.

> Certainly, because I was actively talking to Linda on a regular basis, I suggested to her at some point after that experience that it might be in the interest of the Joyce name to protect it from any third-party use of the Joyce name.
>
> So I suggested that she talk to the lawyers about looking into protecting the Joyce name by trademarking the Joyce name at that time.[83]

Ms. Cahan's conversation with Ms. Shelton was prior to one of respondent's board meetings, not in the formal context of a proposal for action.

> I remember that we, the conversation took place before the board meeting started.[84]

Ms. Cahan is not an expert in trademark law, as evidenced by her statements that "you can trademark your name" and "registering it with the trademark entities." She

---

similar to conversations that she was having at other meetings"), 35 ("She was giving information"), 40, 50.

[83] Cahan Dep., p. 236. *See also* Post Dep., pp. 32 ("I remember that Cora came to that, to a board meeting and said that the Joyce name should be protected from infringement by - - of the sort that we experienced at the 42nd Street"), 40 ("She was having a conversation before the meeting at which she was talking to Linda the way she had been talking to other people about the importance of trademarking").

[84] Post Dep., p. 47-48. However, Linda Shelton testified that the issue of protecting the JOYCE marks was raised at a board meeting, and that Cora Cahan instructed Ms. Shelton to contact Peter Felcher to investigate protecting the marks. (Shelton Dep., pp. 84, 110). Mr. Felcher's testimony is not helpful on this topic because he has no independent recollection of these events. (Felcher Dep. pp. 111-114 and 131-133).

suggested that respondent should protect the JOYCE marks

because respondent was the entity responsible for managing

and operating the Joyce Theater, not because Ms. Cahan

thought that respondent was the owner of the JOYCE marks.

> Q.   Did you think that [respondent] as
>      the company that [petitioner] had
>      created to operate the theater was
>      an appropriate entity to be
>      spending the money to protect this
>      name against the third parties?
>
> A.   They had signed a lease to operate
>      and manage the theater, and they
>      had responsibilities and
>      obligations to operate it as a
>      dance theater and protect it as a
>      dance theater and have certain
>      standards of operation as a dance
>      theater.
>      So indeed, they also had a budget
>      to protect, manage and operate that
>      theater, so it seemed that given
>      their responsibilities and
>      fulfilling the mission as it was
>      set forth by [petitioner], that
>      sure, as part of their
>      responsibilities they should be
>      protecting that name.[85]

> *    *    *    *

> Q.   But if you understood that it was
>      the owner of the building, namely
>      [petitioner], that owned the name,
>      then why wouldn't you have made the
>      recommendation to the owner of the
>      building or its principal, Mr.
>      Feld, in terms of protecting it?
>
> A.   Because actually that's a
>      misstatement in terms of who owned
>      the name.  The name was owned by
>      [petitioner].  However,
>      [respondent] was vested with the

---

[85] Cahan Dep., p. 238

responsibility for protecting, maintaining, and operating the Joyce Theater and all the activities of the Joyce Theater.

So, therefore, if the name of the theater was in jeopardy or if I thought there was some chance that someone else might use it, I might very well have gone to the licensee, the tenant who had responsibility for that building and for the name of that building, and said because I was in a formal relationship with them, I was on the board and vice president of that board, we better protect this name.

We made a commitment to LuEsther and we're responsible for protecting this theater, and it would be consistent with protecting the theater to protect the name because that was an obligation of [respondent].[86]

Accordingly, Ms. Cahan found it logical for respondent to protect the JOYCE marks because respondent was responsible for operating the theater for petitioner.

Despite having recommended that respondent seek protection for the JOYCE marks, Ms. Cahan did not learn that the marks had been registered in the name of respondent, or that they had even been registered at all, until after these proceedings were instituted.[87] In fact, several years after having been removed from the board of trustees for respondent, Ms. Cahan suggested to Eliot Feld that he should

---

[86] Cahan Dep., pp. 276-277. *See also* Post Dep., pp. 10-11, 41.
[87] Cahan Dep., pp. 239-241, 279-283.

consider protecting his company's trademarks, including the JOYCE marks.[88]

Respondent eventually registered the JOYCE marks. At no time did respondent notify petitioner that it had filed any applications or received the registrations.[89] Thus, petitioner was unaware of respondent's actions until petitioner sought to register the Joyce name iteself.[90] Petitioner filed these proceedings promptly after learning that respondent had registered the JOYCE marks in its own name.[91]

Based on the evidence describing the relationship of the parties, we find that petitioner is the owner of the JOYCE marks and that respondent uses the JOYCE marks pursuant to an implied license.

**Decision**: The petition for cancellation is granted and the registrations will be cancelled.

The opposition is sustained and registration to applicant is refused.

---

[88] Cahan Dep., pp. 240-241, 279, 281-282.
[89] Shelton Dep., p. 109.
[90] Feld Dep., pp. 102-103
[91] Respondent did not allege laches as an affirmative defense.